12945

HART v. UNION MFG. & POWER CO.

(154 S. E., 118)

*Messrs. Hughes & Russell* and *Elliott, McLain, Wardlaw & Elliott,* for appellant,

*Messrs. Barron, Barron & Barron, John K. Hamblin* and *Mendel L. Smith,* for respondent,

July 9, 1930.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This action for *tort,* tried in the Court of Common Pleas of Union County, with Honorable Harry Hines presiding as special Judge, resulted in a verdict of the jury in favor of the plaintiff for both actual and punitive damages; and from the judgment entered thereon, the defendant has appealed to this Court.

By several of its fifteen exceptions, the appellant imputes error to the trial Judge in refusing to grant its motion for

a nonsuit, the motion for a directed verdict in its favor, the giving of certain requests to charge on the part of the respondent, the refusal to instruct the jury in some instances, as requested by the appellant, and the failure to grant the motion for a new trial.

A proper disposition of the exceptions relating to the refusal of the trial Judge to grant a nonsuit, to direct a verdict in the appellant's favor, and the failure to give a new trial, will practically dispose of the entire appeal. So we turn first to the questions raised by these exceptions. To consider them, it becomes necessary to review the evidence in the cause. Our statement of it may appear to some to be "one-sided." This is necessary because we are required here, just as it was incumbent upon the trial Judge in the lower Court, under the law, to give the respondent the benefit of any and all evidence in his favor. Since, in our opinion, the evidence set forth in the transcript of record seems to bear it out, we have borrowed freely, from the argument of the respondent's counsel, their summary of the facts disclosed, favorable to the respondent's case.

Claud Hart, the respondent, and his wife, Lula, the parents of Woodrow Hart, a minor of nearly nine years of age at the time of his death, lived with their five children, varying in age from five to fifteen years, in the industrial village of the Monarch Mill in the City of Union. In order to support the family, it was necessary for both to labor in the mill, the father working in the daytime and the mother at night so that one could be constantly with the children. Woodrow attended school during the day and was regarded as an average, normal child of his age.

About 5 o'clock in the afternoon of March 15, 1928, this child was found hanging on one of the appellant's high-voltage electric power wires supported by a metal tower at a place and of the description hereinafter stated. His head was against one of the posts with a little "ball of fire" about his head and foot and in contact with a live wire

strung on the first cross-arm of the tower, about twelve inches from the body of the tower. In a few moments after this discovery, one of his legs was burnt off and fell to the ground, quickly followed by the fall of the remaining part of the lifeless body. His hands, arms, and face were badly burned.

At the time of the death of the intestate, and for some years prior thereto, the appellant generated and transmitted electricity for industrial and lighting purposes from an electric power house located on the Broad River, in Union County, by means of wires placed on poles and metal towers and owned and maintained the tower and transmission wires on which the child was killed.

This type and construction of metal tower, photographic cuts of which are set out in the record, was designated as a "ladder tower." It consists of three metal supports or legs embedded in a cement foundation even with the surface of the ground, in such a relative position that lines drawn through and connecting these points would form an equilateral triangle with the dimension of the sides about twenty-five inches at surface, from which they were so inclined as to approach each other as they were extended upwards and substantially came in contact at a height estimated from *twenty to forty feet.* These legs in this upright position are supported and held together by metal lacings or bracings about three-sixteenths of an inch thick and bolted symmetrically through the three legs of the tower from the bottom to the top. These lacings are so adjusted and bolted on the three sides of the tower as to make an angle of about sixty degrees with the legs, thereby creating a construction of three *ladders,* so combined as to form the triangular metal tower with the latticed or criss-crossing lacings as the rungs. The distance between the lacings at the *ground* was estimated at about twenty inches, gradually decreasing as the top of the tower was approached. At or near the top, within three or four feet, was the first cross-arm, supporting four wires, one of

which conveyed the fatal current and with which the child came in contact.

This ladder construction was not alone of engineering significance, but was intended to be used, and was so used, by the employees of the company as a *ladder* to reach any part of the tower for inspection and needful repair work on the tower or the correction of line or other troubles.

The testimony of numerous witnesses discloses not less than twenty-two statements that such ladders were not only *easily ascended* their *entire distance,* but were *more easily climbed* by a *child* than an adult person or an employee.

The tower was located just outside, about two hundred yards from the nearest houses in a populous mill village. One estimate was one hundred yards. The spot was approached by two streets from the village. It was estimated that probably one hundred children lived within two hundred yards or a quarter of a mile from this tower and had no playground save restricted yards and the roads and streets of the village. The children did "not *congregate elsewhere.*"

There were some gullies near the location of the tower, one being only a few feet therefrom, also some pine sapplings, broom-sedge, trees, bushes, and undergrowth. An old pathway, which was used by the "folks," led from a house above within two or three feet of the base of this tower to a branch below used by the children to "wade" in.

Several witnesses, thoroughly familiar with the physical conditions surrounding this spot, based upon observations extending over years, and conditions generally in the mill village, and certainly familiar by experience and observation with the impulses and promptings of youthful childhood, regarder the place, by reason of its physical characteristics, its close proximity to the mill village, the absence of playgrounds therein, *peculiarly attractive to children.* It seemed to be a favorite place for the congregation and play of children ranging from the age of *four* to fifteen years.

Indeed, it was regarded as the *"regular place in the summertime,"* and "many children played there."

A familiar and impressive picture is presented by the witnesses of the child life that centered about this tower, an agency of death, manifested in a varied form of frolic and play that have been naturally prompted throughout the history of the human race by the sportive, venturesome, and curious nature of the normal child.

Their plays around this spot for at least five or six years consisted of making playhouses in the gullies, dollhouses about the base of the tower, even *on* its cement base; they played "hide and seek" and "spy," and other games.

One of the witnesses declared: "I liked (as a child) to play in the bushes; we would bend down the trees and ride them and ride them and we would play in the gullies and *climb the tower."* She went half way up and none of them had any knowledge of the danger. Others climbed until they took "swimming head" and in one instance until the nose bled. They played what they termed *"back out,"* which was only a banter from one to another for a contest of childish daring and adventure in seeing who could *climb* the *ladders* the highest, and this was going on for years.

Though this metal tower had been maintained for many years there was no effort made to protect or guard the children who congregated about it for play, as testified to by numerous witnesses. In fact, its unguarded condition was conceded by the appellant, its employees not thinking it necessary to guard it.

There was substantial testimony, and reasonable inferences therefrom, to the effect that the company used the single wooden pole as well as the metal tower for the support of its wires; that the metal tower in question was the *first* used beyond the mill village, and at this point the *pole* could have been used without the slightest impairment of the efficiency of appellant's line as it was there constructed.

There was testimony offered tending to show that this

tower could easily have been protected against climbing by small children by putting a substantial wire enclosure about its base, and such was the statement of one of appellant's witnesses, or that the cement base could have been extended a few feet above the surface and the superstructure embedded therein just as safely as when constructed on one even surface, or the lattice lacings could have started a safe distance upwards at the trifling cost of five or six dollars. These precautions could have been installed with insignificant expense and trouble, did not materially impair or weaken the strength of appellant's line or its service, and would have made the tower safer against *climbing by children.*

It is true we have failed to find any positive evidence, affirmatively showing that any agent, servant, or employee of the appellant had direct notice that children were accustomed to congregate and play about and around the tower and to climb thereon. The evidence, however, in our opinion, was entirely sufficient to justify the inference of the jury that the appellant was properly advised of the conditions and circumstances. The employees of the appellant were frequently inspecting its line, and, in the performance of their duties, climbing the tower. All about the tower were indications that the grounds were used constantly by children at play. The paths made by their little feet, and other evidences, were there for the employees to see what had been and was going on. The appellant must have known, and surely its agents must have seen many times, children about the tower. If absolute notice of the conditions was necessary in order to make the appellant liable, the jury had, in our opinion, before it sufficient evidence to warrant it in coming to the conclusion that the appellant for some time had been advised that many children used this place as a playground. In this connection, it may be well to mention that, by the consent of the parties, the jury made an inspection of the tower, where the little boy received his fatal injuries, and the ground surrounding it.

The grounds upon which the appellant urged its motion for nonsuit, those on which it based its motion for a directed verdict, and those upon which the motion for a new trial rested, were really the same. One statement of these, and the sixth, seventh, eighth, ninth, tenth, and eleventh exceptions of the appellant, complaining of certain instructions of the trial Judge, will be reported.

In disposing of the exceptions as to the failure of the presiding Judge to order a nonsuit or to grant appellant's motion for a directed verdict, we must be guided by the rule, repeatedly announced by this Court, and stated lately in the following language:

"On motions for a nonsuit and directed verdict, all the testimony and the reasonable inferences deducible therefrom are to be taken most favorably to plaintiff." (Syllabus) *McCutchen v. Pacific Mutual Life Insurance Co.*, 153 S. C., 401, 151 S. E., 67, 68.

The case of the respondent is predicated upon what is generally designated as the "turntable or "attractive nuisance" doctrine, recognized for many years by this Court, and being first particularly passed upon in the case of *Bridger v. Railroad Co.* 25 S. C., 24. The honor of helping to establish in our state this humanitarian doctrine belongs very much to Honorable James S. Cothran, for some time one of our distinguished Circuit Judges, who presided at the trial of the *Bridger case*.

In the *Bridger case,* a boy under twelve years of age, while playing with other boys on the turntable of the railroad company, was badly injured. A verdict of $5,000.00, in favor of the little boy, was approved by the trial Judge and upheld by this Court. In approving several instructions given by the Circuit Judge to the jury, the Supreme Court took occasion to say this:

"The plaintiff may have been told, and he may have had sufficient capacity to take in the idea, in a general way, that it was wrong and improper for him to be at the turn-

ing-table, and yet not of sufficient capacity to know that he might get hurt by attempting to ride upon it, and consequently not of sufficient capacity to exercise, or be required to exercise, ordinary care, so as to prevent injury. This was one of the points involved in the request, and the Judge very properly brought it out, by inserting the words of modification referred to.

"The appellant's counsel have earnestly pressed upon us the position, that it was the duty of the Circuit Judge to charge as matter of law under the evidence, that the plaintiff from his age and sprightly character was *sui juris,* and therefore subject to the general law, applicable to those of acknowledged capacity. Where it is admitted that the party injured was of sufficient age, or had sufficient intelligence to be responsible for his acts, we do not say but that the Judge might properly charge in such case, that he could contribute to his injury in such way as to exempt the defendant. So, too, where it is admitted that from his tender years or other infirmities he has not sufficient capacity, the Judge might charge, that he could not contribute. But where these matters are matters of doubt, and are points in the issue, depending upon facts to be proved, then they become questions for the jury."

We do not deem it necessary to refer to all of our cases since the *Bridger case,* which have involved the "attractive nuisance" doctrine. In order to show that the Circuit Judge was correct in giving the instructions complained of in this case, when the instructions are considered with the whole charge, we do mention some of our former cases. In this opinion, we take the liberty to make good use of the splendid argument of the respondent which has been of great assistance to the Court.

The sixth, seventh, eighth, ninth, tenth, and eleventh exceptions impute error to the presiding Judge in an alleged failure to embody in his statement of the essential requirements of the doctrine of the "attractive nuisance," as recog-

nized in this state, the qualification that the principle is only applicable when the dangerous instrumentality is placed *within the reach* of the injured child, and the fact that the same "did attract children," and the fact that it was within reach of them and they played with it, it must be brought home to the owner of the premises.

These exceptions, it may be observed at the outset, are evidently based upon a misconception of the nature and scope of a very exhaustive charge on the subject, in the beginning of which, after an impressive statement of the issues, the Court instructed the jury, in part, as follows:

"Now, I charge you, as a matter of law, gentlemen of the jury, that if a man erects and maintains on his premises a dangerous and destructive instrumentality, and so erects it in such form as it appeals to a child, that is, the average normal everyday child, to come in *contact with it,* or *touch it,* or *project with it,* or *play with it,* and a child doing those things which a child would ordinarily do, does come in contact with it and is injured because of the temptation, and because of that faculty of childhood to be tempted by that kind of thing; and a normal everyday child is injured under those circumstances, and the jury reached the conclusion that the plaintiff has shown by the greater weight of the evidence of the danger under those circumstances, the plaintiff would be entitled to recover."

Throughout the charge the idea is continually presented that the liability of the defendant would only be predicated upon such a dangerous instrumentality that "they were at liberty to *handle* or *play with,*" and the injury to be reasonably guarded against was that likely to result from *"coming in contact with it,"* or *"while so playing with it,"* or *"coming in its vicinity."*

With regard to the other criticism of the charge, it will be observed that in response to the appellant's first request to charge, the jury were plainly instructed that "knowledge of the climbing of the tower or using a dangerous instrumen-

tality of the defendant by children in the neighborhood in play must be *brought home* to the defendant before it can be made liable," to which the presiding Judge properly added the universally recognized principle applied in cases of civil liability that "where knowledge is essential, if the facts and circumstances of the case were such as to put the man of prudence and ordinary foresight upon notice of the condition, then the law says he ought to have known it."

It is also plain that the determining factor in an alleged attractive nuisance is not that it be located so that it may be easily reached or within reach by the mere outstretching of the hand, but it is equally so if the agency be of such nature that it tempt or appeal to the venturesome or curious impulse of a normal child, so that it may be easily *put in reach*.

Besides the complaint alleged that this tower was so constructed "as to make said tower of *easy ascent* and *easily climbed* by small children and plaintiff's intestate."

This allegation was read as a material one, and the jury instructed that it was the duty of the plaintiff to establish it by the greater weight of the evidence.

From the full and elaborate charge of the presiding Judge on the subject of the "attractive nuisance," portions of which are made the basis of the criticism embodied in these exceptions, the following composite instructions, comprehensive in nature and in full accord with the decisions in this state, may be stated:

I. That children, wherever they go, must be expected to act upon childish instincts and impulses, and if any dangerous thing or instrumentality is maintained and exposed to the observation of children by the owner of premises, of such character and in such form as to tempt, appeal to, and attract the normal child in play and amusement, and which they, in their immature judgment, might naturally suppose they were at liberty to handle or play with, such owner should

expect such liberty to be taken. In other words, the normal child will do what the normal child is expected to do, and such owner must act accordingly in his effort to adopt reasonable precautions to prevent injury.

II. That the creation and maintenance upon one's property of such an instrumentality or enticement to the "ignorant and unwary" is tantamount to an invitation to visit, inspect, and enjoy, and under such circumstances the duty to "endeavor to protect from the dangers of the seductive instrument or place follows as justly as though the invitation to the ignorant and unwary had been expressed."

III. That if one artificially brings or creates upon his premises a dangerous place or instrumentality which, from its nature, has a tendency to attract the childish instincts and impulses of normal children for play or amusement, and at the same time is dangerous to them, a new duty is imposed upon one maintaining such place or agency, namely, in the exercise of an obvious social duty and the ordinary offices of humanity, to take such reasonable pains, precautions, and ordinary care, without becoming the insurer or guarantor of the safety thereof, as the circumstances reasonably permit, to see that such places or instrumentalities are so safeguarded that children be reasonably protected and not be injured in coming in contact therewith while playing with it or coming in its vincinity.

IV. That although a dangerous place or thing "may not have especial attraction for children by reason of their childish instincts—yet where it is so left exposed that they are likely to come in contact with it, and where their coming in contact with it is obviously dangerous to them, the person so exposing the dangerous thing should reasonably anticipate the injuries that are likely to happen to them, from its being so exposed and is bound to take reasonable pains to guard it, so as to prevent injury to them."

V. That a child under the age of seven years was conclusively presumed to be incapable of committing contribu-

tory negligence, and that there was a *prima facie* presumption that a child between the ages of seven and fourteen was incapable of committing contributory negligence, but this presumption was rebuttable and might be overcome by the testimony in the case, and whether it was rebutted or not was a question for the jury to determine from the evidence submitted.

VI. That if the death of the child in this case was due to the contributory negligence of the parents in allowing him to go about without proper control and supervision, and such parents are the beneficiaries. their contributory negligence would bar recovery in this action.

The instructions of the Court dealing with the pertinent phases of this subject not only clearly recognized the sanctioned doctrine in this state, but in presenting it to the jury for their guidance, substantially adopted the language of this Court in the cases of *Hayes v. Power Co.*, 95 S. C., 230, 78 S. E., 956; *Franks v. Oil Co.*, 78 S. C., 10, 58 S. E., 960, 962, 12 L. R. A. (N. S.), 468; and *Renno v. Seaboard Air Line Railway*, 120 S. C., 7, 112 S. E., 439, the facts in which cases were not stronger than in the present case.

In the case of *Franks v. Oil Co.* the Court sustained the liability of the defendant for the death of an infant by drowning in an unguarded reservoir maintained by it in its business in an open field near a public highway, streets, and many residences of a city, where children of tender years, with knowledge of the corporation, were accustomed to resort to play.

The appeal in that case involved the correctness of the ruling of the presiding Judge in overruling a demurrer to complaint, upon the ground that it did not show the violation of any legal duty owing to the deceased in regard to the unprotected condition of the reservoir.

In disposing of the exception presenting the single question, the Court quoted with its unqualified approval numerous extracts from recognized authority throughout the

country, embracing the decisions of Courts of high standing as well as text writers of universal recognition, setting forth what it widely sanctioned as the correct doctrine in such cases, among which may be mentioned, in support of the views and instruction of the presiding Judge, the following:

" 'Children, wherever they go, must be expected to act upon childish instincts and impulses; and others, who are chargeable with a duty of care and caution towards them must calculate upon this and take precautions accordingly. If they leave exposed to the observation of children anything which would be tempting to them, and which they, in their immature judgment, might naturally suppose they were at liberty to handle or play with, they should expect that liberty to be taken.' * * *

"Under the caption of 'Liability for Injuries to Children,' the author in 1 Thompson on Neg., § 1026, thus speaks in strenuous language of the doctrine that liability extends only to *wanton* injuries: 'One doctrine under this head is that if a child trespass upon the premises of the defendant, and is injured in consequence of something that befalls him while so trespassing, he cannot recover damages unless the injury was *wantonly inflicted,* or was due to the recklessly careless conduct of the defendant. This cruel and wicked doctrine, unworthy of a civilized jurisprudence, puts *property* above *humanity,* leaves entirely out of view the tender years and infirmity of understanding of the child, indeed his inability to be a trespasser, in sound legal theory, and visits upon him the consequences of his trespass, just as though he were an adult, and exonerates the person or corporation upon whose property he is a trespasser from any duty towards him which they would not owe under the same circumstances towards an adult.' "

In the case of *Hayes v. Power Co.* the plaintiff was a boy nine years of age living on the property of the defendant, Manchester Mills. He was seriously burned and injured by coming in contact with an electric wire in the transformer

house located on the property of the defendant. The boy for several months previous to the time of the injury had been attending school in a building near the transformer house. During the recess hours the children were accustomed to play in the neighborhood of the transformer house, sometimes at one place and again at another. The Manchester Mills were principally in control of the transformer house, although agents of its codefendant, Southern Power Company, occasionally visited it for the purpose of making needful repairs in the electrical apparatus. The electric power wires were located in this house, near one of the windows five or six feet from the ground, too high for the plaintiff to come in contact with the same when standing on the ground. On the day plaintiff received his injuries, he with two or three small boys went to the transformer house at the noon recess, and when first seen after his injury had his knee in the window and was hanging out by his hand. His hand was through the window touching the wires. In his account of how he received the injury, the plaintiff stated that the other boys had told him that if he touched the wires it would make him jump up and dance. Before plaintiff could touch the wires, or in any way come in contact with them, *he had to climb up in the window,* place his hands between the slats and under the window, and this seemed to be the only manner in which his injury could be received. The neglignce alleged was keeping the windows *"open and unprotected"* with wires charged with electricity within close proximity thereof. All of the buildings were located on the property of the Manchester Cotton Mills.

The trial Judge in that case instructed the jury, in substance, that to maintain upon one's property enticements to the ignorant and unwary amounts to an invitation to visit, inspect, and enjoy, and in such cases the owner is under legal obligation to make a reasonable effort to protect from the dangers of such seductive instrument or place and the invitation is just the same as though it had

been expressed; that while an infant might be a trespasser, that is, an infant of tender years, in a technical sense, when it goes where it has no rightful permission or authority to be, but the same rule would not apply to infant as to adult trespassers, and in connection with this instruction he read at some length an extract from the *Franks case* in reference to the contention that liability in such cases only extend to cases of injuries arising from a *wanton* act. ·

All exceptions to these instructions were overruled, the Court declaring with its approval that they were taken from the *Franks case*.

In the case of *Renno v. Railway Co.,* a boy about nine years old was drowned while swimming in an undrained and unguarded pool of water formed on the defendant's premises by the violent rush of water through a culvert too small for the purpose of drainage, after knowledge that boys resorted to this place for the purpose of swimming, and that by reason of its depth it was dangerous for this purpose.

The Court *en banc* held that the case fell within the "attractive nuisance" doctrine. In denying the contention of the defendant to the contrary, the Court again invoked, with an unqualified approval, the principles so clearly and elaborately stated in the *Franks* and *Hayes cases.*

And this Court in the subsequent cases has adhered so constantly to the doctrine thus repeatedly announced that the legal principles controlling in such cases are perfectly plain, and the practice of adopting the language of this Court in presenting them for the guidance of the jury by the trial Judge is to be highly commended.

In addition to the cases to which we have referred, we call attention to other cases, which confirm generally the views herein expressed, as follows: *Tucker v. Cotton Mills,* 95 S. C., 302, 78 S. E., 890; *Tucker v. Cotton Mills,* 96 S. C., 466, 81 S. E., 182; *Sexton v. Construction Co.,* 108 S. C., 516, 95 S. E., 129; *McLendon v. Hampton Mills,* 109 S. C.,

238, 95 S. E., 781; *Haithcock v. City of Columbia,* 115 S. C., 35, 104 S. E., 335; *Morris v. Langley Mills,* 121 S. C., 200, 113 S. E., 632, 36 A. L. R. 302; *Pigford v. Cherokee Falls Manufacturing Co.,* 124 S. C., 389, 117 S. E., 419.

The appellant urges that the recent case of *Williams v. City of Sumter,* 149 S. C., 375, 147 S. E., 321, sustains thoroughly its position and is conclusive of the case at bar. We are unable to agree with that view. That case is easily distinguished from this case. In the former, the City of Sumter was the owner of its electric light and ice plants, erected poles and extended its electric lines beyond the city limits along a certain roadway or street for the purpose of supplying electricity to the people residing thereon, among whom was the plaintiff, a boy between nine and ten years of age.

The last pole  erected on this roadway was supported by a guy wire extending from the top of the pole to the ground, a ligitimate purpose, and was insulated nine feet and four inches above the ground. Owing to the placing of a feed wire leading to one of the houses west of the Williams' home on this guy wire, the latter became charged with electricity down to the insulator. The plaintiff climbed this wire beyond the insulated part and was severely shocked and injured in an effort to extricate him from his perilous position.

The opinion in this case does not in terms declare the nature and form of the action. The only act of negligence referred to "is that the defendant permitted the portion of the guy wire above the insulator to become a conductor of the electric current, so that, when the plaintiff climbed up and caught the wire above the insulator, he received an electric shock," etc.

If the action be viewed as one involving the statutory liability of the city for bodily injury or damage to the person through a defect in a street by reason of neglect or

mismanagement, then liability could only be predicated on some act of nonfeasance or misfeasance connected with a failure to keep the street in proper and safe repair, or some act of omission of commission which rendered the street not reasonably safe for "prime street purposes." *Dunn v. Barnwell,* 43 S. C., 398, 21 S. E., 315, 49 Am. St. Rep., 843; *Irvine v. Greenwood,* 89 S. C., 511, 72 S. E., 228, 36 L. R. A. (N. S.) 363; *Burnett v. City of Greenville,* 106 S. C., 255, 91 S. E., 203, Ann. Cas., 1918-C, 363; *Triplett·v. City of Columbia,* 111 S. C., 7, 96 S. E., 675, 1 A. L. R. 349; *Foster v. City of Union,* 129 S. C., 257, 123 S. E.; 839.

In the *Williams case,* the Court held that it was not contended that the indicated use of the guy wire "was not a perfectly legitimate use," and that it was "clear from an examination of the testimony that Hampton Avenue at the point and time of the accident, *so far as danger from electric wires was concerned,* could have been used by the public *for all legitimate purposes with absolute safety."*

The facts of the case were held to meet requirements of the statute and interpretative decisions of the Court as to the basis of municipal liability in such cases. The doctrine of the *attractive nuisance* was not invoked in this case, for although the dangerous agency or instrumentality created or maintained on one's premises may be essential to his business or enterprise and even free, for this purpose, from objectionable construction and characteristic, yet, if it is reasonably calculated to tempt, invite, or attract childish instincts and impulses to dangerous play or adventure, the law imposes an *additional* duty demanded by strong social consideration and the offices of humanity, to take such reasonable precautions as will prevent injury. There is an essential difference between an allegation of *negligence* in allowing the wire to be charged with a deadly current of electricity "above the insulator," a *negligent creation* of a dangerous condition, and, in assuming that such

condition exists, a *negligent* failure to so reasonably guard it as to prevent injury to a child where the defendant knows, or should know, that children congregate, by reason of the appeal that it naturally makes to the venturesome and sportive impulses for play and amusement possessed by the average child.

If the plaintiff in the *Williams case* relied on the principle announced in the case of *Irvine v. Greenwood, supra,* it is clear that case does not change or modify in the least the ground of municipal liability, but only holds "that playing by boys and girls while they are still of the age of youthful sportiveness is" *not* "an *illegitimate* use of the street, not to be anticipated by authorities whose duty it is to keep highways in a *reasonably safe* condition."

In this case, the Court further held, under the testimony, "that children could have played there without the least danger of being injured." Suppose that instead of a guy wire a *ladder*-like device had been substituted, easy for children to climb and actually used in this way by the employees of the city, and the doctrine of the *"attractive nuisance"* had been invoked as the basis of liability with the new legal duty it imposes, there is not a word in the *Williams case* warranting the view that the Court would, or could, have reached a similar conclusion upon this state of facts in conformity with the decisions in this state.

From the standpoint of an "attractive nuisance," it was for the jury to say whether an agency suitable for climbing, actually used for the purpose by the employees of the company, left in an open and unguarded condition and located in the playground of children, was a standing invitation to the child to venture thereon, and whether it should have been protected.

The words "ladder" and "climb" are so intimately associated that even to think of one suggests the other, and the observation of a "ladder" by the average child naturally

invites and suggests the *act* of *climbing,* just as a pool the act of swimming.

If the Williams action be reviewed as one in which it was sought to hold the city liable at common law for a tort in the operation of its electric plant *beyond* the city limits, upon a public street or highway, it is obvious that the vitality and force of the act of negligence charged depended upon the fact that the *street* or highway was thereby rendered *unsafe* for *legitimate street purposes.* For these reasons, the cases are easily distinguished.

A still more recent case of our Court is that of *Weeks v. Carolina Power & Light Co. et al.,* 155 S. C.,—, 153 S. E., 119, 122. On the authority of *Hayes v. Southern Power Co., supra,* and other cases, we made this declaration: "Power companies and their employees, even more than other people, ought to know the great danger of electricity. They ought to take care to see that their wires, which convey electric current, are properly guarded, so as to prevent injuries to persons and property. This duty it incumbent upon them under the law of this state."

Companies engaged in the manufacture, distribution, and sale of electricity have a great place in the modern development of our state. Because of this, they are given many great privileges, including the right to take, under condemnation proceedings, the home of a citizen. Along with these great privileges, there rests upon them high duties and responsibilities. We are much impressed by the language of Honorable Heriot Clarkson, a native South Carolinian, of whom we are proud, for some time past an Associate Justice of the Supreme Court of North Carolina. Speaking of electricity and the duty of those engaged in the business of producing and selling it, he said this:

"The rattlesnake warns its victim, but not so with this subtle, invisible, and death-producing power. It is a matter of common knowledge that this wonderful force is of un-

told benefit to our industrial life. Electric power is an industry-producing agency and the hydro-electric development has been one of the greatest factors in the state's progress and especially its industrial expansion. Every legitimate encouragement should be given to its manufacture and distribution for use by public utility corporations, manufacturing plants, homes, and elsewhere. On the other hand, the highest degree of care should be required in the manufacturing and distribution of this deadly energy and in the maintenance and inspection of the instrumentalities and appliances used in transmitting this invisible and subtle power." *Ellis v. Carolina Power & Light Co.,* 193 N. C., 357, 137 S. E., 163, 166.

We cannot close this part of our opinion in a better way than by indorsing one sentence contained in the opinion of Honorable Frank B. Gary, Circuit Judge, in the case of *Renno v. Seaboard Air Line Railway Co., supra,* used by him in speaking of the doctrine of "attractive nuisance," namely, "This rule emanates from an enlightened humanity that places human life above the dollar."

The twelfth exception charges error on the part of the presiding Judge in refusing to instruct the jury that there was no evidence in the case to support a verdict for punitive damages. A conscious failure to observe due care, under the circumstances, is enough, under the law of this state, to warrant an assessment of exemplary damages. It is unecessary to cite any of the numerous authorities going to sustain this holding. A review of the evidence, already given, disposes of this exception.

The fourteenth and fifteenth exceptions are too general for our consideration. In brief, they charge that the verdict was contrary to the law and evidence of the case, since there was no proof of negligence on the part of the appellant, and no proof whatever of willfulness. If we could consider these exceptions, what

we have already said would show that they are without merit.

By its second and third exceptions, the appellant complains that the presiding Judge, in refusing the motion for a non-suit, made use of certain language in the presence of the jury, which was an expression of opinion by the Court on the evidence in the case, and was, in effect, a charge upon the facts. The language complained of is as follows: "There was testimony this did constitute an attractive place for children to climb, to play about," and "it seems to have been notoriously known they congregated there for the purpose of playing." The appellant has not given due regard to all the presiding Judge said. Right at the beginning of the announcement of his reasons for refusing the motion, he said this: "Now, gentlemen, I can't pass upon the testimony except as it relates to the motion for non-suit. The plaintiff is entitled to the most favorable construction of that testimony on that motion." He then proceeded to refer to the allegations of the complaint and to certain matters set up by the defendant. Just before using the language, which the appellant objects to, the Judge said, "without passing upon the strength of the testimony," and then, in referring to the testimony, he used the language complained of by the appellant. Right after using his last expression, which is challenged, he said, "Now, as I ruled this morning as to what constitutes an attractive nuisance is for the jury."

In passing upon the language of the trial Judge, it is our duty to consider all that he said. It would be entirely unfair to him, and to the parties to the cause, to select here and there an expression and come immediately to the conclusion that the Judge had given to the jury his impression of the facts of the case. The whole statement, which we have read carefully, convinces us that Judge Hines did not say anything which improperly impressed the jury with his view of the evidence.

In charging the jury, the trial Judge said:

"Now, gentlemen of the jury, the plaintiff in this case, before he can ask a verdict at your hands must make out his case, the material allegations of this complaint, or some of the material allegations of his complaint by the greater weight of the evidence. That is, it is incumbent upon the plaintiff to prove by the greater weight of the evidence, to the satisfaction of the jury the material allegations of his complaint, or some of the allegations before he can ask a verdict at your hands."

By the fifth exception, the appellant contends that the last sentence of the quoted charge was erroneous, for the reason that thereby the jury was permitted to find a verdict on allegations in the complaint that were not material. The gist of the complaint is the failure of the Judge to use the word "material" before the word "allegations" in the second sentence. It will be seen that he did use it in the first sentence. We are quite sure this inadvertence of the Judge was discovered some time after the trial by a very close examination of his charge. We are confident that if it had been noticed when the charge was being given some attorney in the case would have called the attention of the Judge to his slight error. If it was noticed, it was the duty of the attorney to call attention to it. Since the attorneys, evidently, did not catch this insignificant error on the part of the Judge at the time he was speaking, we are justified in assuming that the jurors, not trained to observe technical matters as closely as lawyers, also failed to note the fine distinction which is now made. We cannot believe the appellant suffered any prejudice because the Judge failed to repeat the word "material."

The judgment of this Court is that all the exceptions be overruled, and the judgment of the lower Court be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES STABLER and CARTER concur.

Mr. Justice Cothran (dissenting) : This is a case which in its circumstances and horrible and distressing consequences appeals most strongly to the sympathy of the Court; a bright, spirited boy, full of the buoyancy of youth, thoughtless of danger, undertakes a too hazardous venture and comes to an untimely death. The Court, however, is confronted with the cold issue of law, free from the intriguing influences of sentiment, sympathy and horror, whether upon the record and the facts proved, the verdict can be sustained, and the owner of the property on which the accident happened, held responsible for its consequences.

To sustain the verdict, the plaintiff relies upon a rule, which in the quoted remark of his Honor, Circuit Judge Frank B. Gary (concurring opinion in the *Renno case*), is stated to emanate "from an enlightened humanity that places human life above the dollar." But as was said by the Court in the case of *Buddy v. R. Co.,* 276 Mo., 276, 207 S. W., 821, 825:

"Ought, then, a doctrine resting, *firmly and beneficently we concede, but solely,* upon the humane sentiment of putting humanity above property, \* \* \* but otherwise ignoring legal landmarks and all other known and settled grounds of legal liability, be, absent legislation, further extended? We think not."

The designation of the doctrine commonly referred to as the *"attractive nuisance* doctrine" is unfortunate; it would be more properly designated as the "attractive *instrumentality* doctrine," the word "nuisance" indicates an unlawful use of one's property to the damage of another; in this case it could not be contended that the defendant was at the time of the injury making such use of its property.

We have then to deal, *in limine,* with the unquestioned lawful use by the defendant of its own property upon its own premises, in relation to one admittedly a trespasser upon that property; the deceased boy may have been a licensee so far as using the premises as a playground, but as to the

tower he unquestionably was a trespasser. The presumption is that such lawful use by the defendant of its own property did not create a legal liability; if it did cause injury to another, the burden is necessarily upon such other to show circumstances of *mal* use which directly produced the injury.

The general rule, applicable alike to adults and children, is that whether trespassers or licensees, the proprietor of the premises is not required to keep them in a safe condition for their benefit.

"Generally, the owner or occupier of premises owes the same duty to adults and children, who go upon the premises by express or implied invitation. As a general rule, he is not required to keep them in a safe condition, for the benefit of trespassers or licensees whether they are adults or infants." *Sexton v. Wall Const. Co.,* 108 S. C., 516, 95 S. E., 129, 131.

In *Franks v. Southern Cotton Oil Co.,* 78 S. C., 10, 58 S. E., 960, 961, 12 L. R. A. (N. S.), 468, the Court quotes with approval the following from Thompson on Negligence:

"As a general rule, he is not bound to keep his premises safe, or in any particular condition, for the benefit of the *trespassing children* of his neighbors, or for the benefit of children who occupy no more favorable position than that of *bare licensees.*" (Italics by the Court.)

In *New York, N. H. & H. R. Co. v. Fruchter,* 260 U. S., 141, 43 S. Ct., 38, 39, 67 L. Ed., 173, the Court said:

"Infants have no greater right to go upon other people's land than adults, and the mere fact that they are infants imposes no duty upon landowners to expect them and to prepare for their safety." The foregoing is a quotation from the case of *United Zinc & Chemical Co. v. Britt,* 258, U. S., 268, 42 S. Ct., 299, 66 L. Ed., 615, 36 A. L. R., 28.

In the case last cited (Britt), the Court said further:

"If the children had been adults they would have had no case. They would have been trespassers and the owner of

the land would have owed no duty to remove even hidden danger; it would have been entitled to assume that they would obey the law and not trespass."

A well-recognized exception to the general rule above stated appears in cases of children who with "drawings strong" have been attracted by their childish instincts of play, amusement, curiosity, or dare-deviltry to climb, meddle with, play upon, a dangerous instrumentality left exposed in a place or under circumstances in which the proprietor may have had reasonable grounds to anticipate their trespass or exercise of an implied invitation, a license.

In *Franks v. Southern Cotton Oil Co.,* 78 S. C., 10, 58 S. E., 960, 961, 12 L. R. A. (N. S.) 468, the Court in its opinion quotes with approval the following from Thompson no Negligence, § 1024.

"A well-grounded exception to the foregoing principles is that one who artificially brings or creates upon his own premises any dangerous thing which from its nature has a tendency to attract the childish instincts of children to play with it is bound, as a mere matter of social duty, to take such reasonable precautions as the circumstances admit of, to the end that they may be protected from injury while so playing with it, or coming in its vicinity."

The Court also quotes the following from Cooley on Torts, 624:

"In the case of young children, and other persons not *sui juris,* an implied license might sometimes arise, when it would not in behalf of others. Thus, leaving a tempting thing to play with exposed where they would be likely to gather for that purpose may be equivalent to an invitation to them to make use of it."

In the Franks *Case,* the Court also quotes with approval the following from 1 Street Foundations, 160:

"Liability in the turntable cases is strictly put upon the ground of implied invitation to children to come upon the premises in order to play there, the invitation being sup-

posed to arise from the attractive nature of these dangerous engines."

And the following from 1 Bishop Non-Cont. Law, 854:

"A child too young to be controlled by reason therefore not improperly led by its instincts receives from the law the protection which its special nature requires. For example, a man who leaves on his ground, open to the highway or upon or beside any public place, a dangerous machine, likely to attract children, will be liable to one injured by playing with it, if he neglected precautions against such an accident."

See also 7 A. & E. Enc. Law, 403.

The Court also cites with approval the following authorities to the same effect: *Pekin v. McMahon,* 154 Ill., 141, 39 N. E., 484, 27 L. R. A., 206, 45 Am. St. Rep., 114; *Biggs v. Wire Co.,* 60 Kan., 217, 56 P., 4, 44 L. R. A., 655; *Price v. Water Co.,* 58 Kan., 551, 50 P., 450, 62 Am. St. Rep., 625; Cooley on Torts (2d Ed.), 718; 1 Thompson Neg., 303; *Dobbins v. R. Co.,* 91 Tex., 60, 41 S. W., 62, 38 L. R. A., 573, 66 Am. St. Rep., 856; *Kopplekom v. Pipe Co.,* 16 Colo. App., 274, 64 P., 1047, 54 L. R. A., 284; *Powers v. Harlow,* 53 Mich., 507, 19 N. W., 257, 51 Am. Rep., 154; *Keffe v. R. Co.,* 21 Minn., 207, 18 Am. Rep., 393.

In *Sexton v. Noll Const. Co.,* 108 S. C., 516, 95 S. E., 129, 131, the Court said:

"A new duty does not arise until he maintains upon his premises a dangerous instrumentality, which tends to attract the youthful instincts of children, to use it for their amusement. Where he has on his premises something that is both attractive and dangerous to children, he is bound to exercise ordinary care to prevent injury to them by coming in contact with it."

A very clear statement of the law is found in the case of *Simonton v. Citizens', etc., Co.,* 28 Tex. Civ. App., 374, 67 S. W., 530, 531:

"Under the common law no duty is imposed upon the owner to use care to keep his property in such condition that persons going thereon without his invitation may not be injured, his only duty to persons thus entering upon his premises being to abstain from willfully injuring them. This rule of law applies to infants with the same force that it does to adults, but in certain classes of cases an invitation by the owner to enter upon his property will be implied by estoppel in favor of children from facts that would raise no such implication as to adult persons. * * * Ordinarily an invitation will not be implied unless the property is designed or used by the owner for public purposes, such as a hotel or store where a mercantile business is conducted, and the person entering upon the premises is carrying out a purpose or design which is to the common interest or advantage of the owner and himself. * * * But in the case of injury to children our Courts have gone much further, and have established the doctrine that an invitation may be implied by estoppel, even against the intention of the owner, if such owner maintains upon his premises, where children are likely to be, something which on account of its nature and surroundings, is especially and unusually calculated to attract, and does attract, them, and induce them to go upon his premises."

In *Haithcock v. Columbia*, 115 S. C., 29, 104 S. E., 335, 336, it was held that the question at issue was "whether there was negligence on the part of the City of Columbia in maintaining on its premises a dangerous instrumentality calculated to attract the youthful instincts of the plaintiff, and whether he was guilty of negligence that contributed to his injury. * * * "

The *Renno case*, 120 S. C., 7, 112 S. E., 439, was distinctly decided upon the issue of the attractiveness of the pool of water to the boyish instinct.

The case of *Hayes v. Power Co.*, 95 S. C., 230, 78 S. E., 956, was distinctly decided upon the ground that the open

window may have been found by the jury an attractive instrumentality to the child, in connection with the proximity of the charged wires which he was told would cause him to tingle and dance.

So with *Tucker v. Mills,* 95 S. C., 302, 78 S. E., 890.

In *Pigford v. Cherokee Falls Mfg. Co.,* 124 S. C., 389, 117 S. E., 419, 420, the decision was based upon the attractive theory: " * * * The issue of the defendant's negligence in maintaining a reservoir upon his premises, alluring to immature children, known to be dangerous and insufficiently protected against their depredations and consequent injury. * * * "

In *Witte v. Stifel,* 126 Mo., 295, 28 S. W., 891, 892, 47 Am. St. Rep., 668, the Court said, after citing cases:

"The cases cited are more favorable to the plaintiffs than any to which our attention has been called or that we have been able to find, but in all of them the object which caused the injury was a dangerous object left exposed, without guard or attendant, in a place of public or common resort for children, whose natural instincts prompted them to meddle and play with it. * * * *It is only in case of attractive machinery,* or other objects similar in their effect, that children, when injured without fault or negligence on their part, are entitled to recover for personal injuries occasioned thereby. * * * and even then such right seems to be predicated of the fact that children are in the habit of resorting to such places for play, with the knowledge of those in charge of such object or machinery."

"Children, no less than adults, when they trespass upon the property of another, take the risk unless the circumstances bring the case within the principle of what is known as the Turntable Cases, where a dangerous instrumentality is maintained, with knowledge, actual or constructive, that it is alluring to children and endangers them. A wire 18 feet above the ground, which can only be reached as this wire was, cannot be said to fall within the exception to the general

rule." *Mayfield Water & Light Co. v. Webb,* 129 Ky., 395, 111 S. W., 712, 713, 18 L. R. A. (N. S.), 179, 130 Am. St. Rep., 469.

In *Riedel v. West Jersey & S. R. Co.* (C. C. A.), 177 F., 374, 378, 28 L. R. A. (N. S.), 98, 21 Ann. Cas., 746, the Court said:

"The present case, therefore, differs obviously from the cases referred to, the decisions in them being founded upon the maintenance of a dangerous appliance or object on the owner's premises which presented enticement and allurement to children, and to which they were in the habit of resorting, to the knowledge of the defendant. There was thus an implied invitation or license to the children to enter upon the premises, by reason of which they were divested of the character of trespassers, and there was imposed upon the defendants the duty of exercising reasonable care for their protection."

It appears undeniable from the complaint that the cause of action is based solely upon the effort of the plaintiff to bring his case within the principle of an attractive instrumentality. The complaint is loaded with such expressions as that the tower as constructed and maintained constituted "an attraction, temptation and invitation" to climb and ascend it; that the boy "led on by his childish instincts in a spirit of fun and play climbed up the said tower"; that the criss-crossings presented a "ladder-like appearance, attractive to children"; that the boy was "tempted and attracted to climb the same," and was "induced and enticed to climb"; that he was "tempted, invited and enticed to go upon the said tower and climb the same"; that he was "led on by childish instincts, was attracted to climb the same"; that the tower was "so constructed as to be inviting and of easy ascent"; that the boy was "enticed, invited, and tempted to play on and around the same and to climb the same"; and he was "attracted and induced to climb the same"; that he was "induced and enticed to climb the same," etc.

In the printed brief of counsel for the respondent it is declared:

"The alleged liability of the appellant was based upon what is designated as the 'attractive nuisance' doctrine, and it was charged in support of this theory with the negligent and willful maintenance of a ladder-type tower, in an unprotected and unguarded condition, of such form and design as to be attractive to children, as the result of which the deceased child climbed the tower to a point at which he came in contact with the heavily-charged wire and received the fatal current of electricity."

It is clear therefore that the plaintiff's cause of action is based solely upon the attractive instrumentality doctrine, and hence, if there were no other objection to it, the charge complained of in the tenth exception should not have been given:

"Although the dangerous thing may not be what is termed an attractive nuisance—that is to say, may not have especial attraction for children by reason of their childish instincts— yet where it is so left exposed that they are likely to come in contact with it, and where their coming in contact with it is obviously dangerous to them, the person so exposing the dangerous thing should reasonably anticipate the injury that is likely to happen to them, from its being so exposed, and is bound to take reasonable pains to guard it, so as to prevent injury to them."

In addition to this ground of error, it seems clear that the charge was in direct antagonism to the principle declared in the foregoing quotations, that *an infant trespasser or licensee can only recover upon the theory of an attractive instrumentality.*

Considering then the doctrine of "attractive instrumentality" and its application to the facts of this case:

It has been recognized and clearly defined, with distinct limitations beginning in this country with the case of *Sioux City & P. R. Co. v. Stout,* 17 Wall., 657, 21 L. Ed., 745,

in 1873, and threading its way through a great number of cases, some approving, others not, and many approving but declining to extend it beyond practically the conditions shown to have existed in that case. This Court has, properly I think, approved the principles announced in that case in numerous cases, cited in the leading opinion herein.

From it I think that the following principles may be deduced:

1. The fact that the child may have been technically a trespasser or licensee, at the time of its injury, does not relieve the proprietor of liability if the elements of the doctrine of attractive instrumentality be shown to have existed.

2. The instrumentality, in which I mean to include every form of injurious agency, must be shown to have been dangerous.

3. It must be shown to have been alluring to children, appealing to their childish instincts of curiosity, amusement, adventure or other.

4. It must be shown to have been in a place open, accessible to, and frequented by childen

5. That the danger was not appreciated by children.

6. That the proprietor had knowledge actual and imputed of the habit of children to be on, in, or about the instrumentality.

7. That the injury might reasonably have been anticipated or foreseen had the proprietor exercised the care and forethought of a reasonably prudent person.

8. That the proprietor with knowledge, actual or imputed, of these circumstances, did not exercise ordinary care to prevent the injury.

The undisputed facts of the case are these:

The defendant was engaged in a legitimate enterprise, the transmission of electric power; it could only be accomplished by means of wires strung upon poles, either metal or wood; the company, as it had the right to do, and which

common experience teaches was safer for the public generally, more stable and economical, erected towers of steel, set in cement; the towers were 35 or 40 feet high, and the wires were strung upon cross-pieces very near the top of the tower, fully 30 feet from the base; perfectly safe to the public except in case of accidental breaking of and allowing the wires to sag to the ground; it was impossible for the current to escape and injure any one near the tower or wires unless the tower was climbed and contact thereby with the charged wires made.

It does not appear to the contrary, and I assume it to be a fact that the company had simply an easement of right-of-way, which naturally would confine its dominion to the land actually occupied by the towers, with the right of ingress and egress for the purpose of maintaining its lines; it would have no right to interfere with the use of the premises by the owner or the public as a playground.

The construction of the tower is sufficiently described in the opinion of Mr. Justice Blease. I may emphasize the fact that the base of it was a concrete pillar in which the legs of the tower were incased and could not have been more than two feet square; the three legs of the tower were about that distance apart and gradually approached each other until they united at the top.

The frequency and manner of use of the premises near the tower as a playground are also sufficiently and dramatically described with a touch of pathos.

It appears that some of the children were in the habit of climbing the tower, using the criss-crossed strips as the rungs of a ladder. The three girls who testified to such use ascended only a part of the way and were forced to come down by fear and swimming of the head; not a single instance is given of any child attempting to climb to the top of the tower where the danger was, and these girls showed evidently that they knew it was wrong to go even as far as they went. The tower had been erected for years and the

only instance of a boy coming within the zone of danger was the boy who was killed. If any one of the girls had fallen in the attempt to climb the tower, it would have been a strain upon the doctrine to hold the defendant liable for the effect of the fall, even if the other essential elements had been shown.

It is true that some of the witnesses testified that it was easier for a child to use the trellis work of the tower as a ladder than for a grown man. That was mere matter of opinion, and in view of the fact that the strips were bolted to the uprights at an angle of 30 degrees, forming a sharp V, it is incredible that a smaller foot would find the ascent easier than a larger one.

I do not find, after reading the entire testimony, a particle of evidence that the company knew, or had reason to know, of the habit of even the girls to climb the tower; certainly there is none of a habit to climb up within the danger zone.

It is argued in the leading opinion, which concedes that there is no positive evidence that any agent, servant, or employee of the company had direct notice that children were accustomed to congregate and play about and around the tower and *to climb thereon*, that because the evidence that the premises were used as a playground was patent, the jury had enough to find not only that, but that the tower was used is climbing as a pastime. Certainly the frolicking of the children among the gullies and small trees, or the presence of "little footprints that lightly pressed the ground," could hardly support an inference of something entirely different.

I think, too, that there was not a particle of evidence tending to charge the defendant with a reasonable anticipation that any child would undertake what the boy undertook, to climb to the top of the tower. Even if the company knew that the premises, over which it had no control, were used as a playground, and that girls attempted to climb the tower a part of the way, it could not be inferred that some ad-

venturous youth would attempt the almost impossible feat for a child, of climbing to the top of the tower.

It may be true, as doubtless it is, that quite a large number of children in the neighborhood used the premises around the tower as a playground, among the gullies and bushes; that they made frog houses and mud pies and rode the tree horses; the tower did not interfere with their innocent amusements; no harm ever came to them; such use was in no sense notice to the defendant that any of them would attempt the most improbable form of amusement of climbing the tower.

It is significant that the boy Hart was not allured to the premises by the sight of the tower. It appears that he and two other boys went there to play among the gullies and bushes and were harnessed up "playing horse." The two companions, Owensby and Reynolds (or Randall), were not put upon the stand; they, so far as the evidence shows, were the only children at play on the premises, and it is impossible to say what called the Hart boy from his horse play to the tower; certainly it does not appear that he and the other boys were playing "back out on the tower. He appears to have been seized by a sudden impulse, without purpose, to climb the tower.

The case of *New York, N. H. & H. R. Co. v. Fruchter,* 260 U. S., 141, 43 S. Ct., 38, 39, 67 L. Ed., 173, appears to me conclusive of the question at issue. In that case it appears that the track of the railroad company at a certain point in the City of New York was in a cut, and that a street, perpendicular to the railroad, crossed it upon a bridge or viaduct, there being a clearance of twenty-three feet from the track to the lowest girder of the bridge; the bridge was supported by steel piers with strengthening lattice work; at one end of the bridge the railroad company had erected two steel towers the bases of which were the upper girders of the bridge; the towers were likewise strengthened with lattice work similar to those of the piers; about six feet from the bases of the steel towers, cross-arms were affixed upon which

wires carrying electric currents were strung. The boy, eight years old, climbed from the railroad track by means of the lattice work on the piers to the bed of the bridge in quest of a bird nest; seeing a pigeon on one of the overhead wires near the steel tower, he climbed up the steel tower to the level of the wires and reached for the bird; it flew away; his hand touched the wire, and severe injuries resulted. It appeared that boys often climbed the piers of the bridge and some reached the steel towers; they were frequently chased away by policemen and the railroad guard. The case was tried in the District Court and the plaintiff had a verdict; upon writ of error the judgment was affirmed by the Circuit Court of Appeals, 271 F., 419. Upon *certiorari* the Supreme Court of the United States reversed the lower Courts and directed judgment in favor of the defendant.

The Court said:

"The Court below accepted the theory that the jury could have found the structure was well known to be both dangerous and attractive to children, and that failure to supply proper guards, human or mechanical, constituted negligence within the doctrine of *Railroad Co. v. Stout,* 17 Wall., 657, 21 L. Ed., 745, and *Union Pacific Ry. Co. v. McDonald,* 152 U. S., 262, 14 S. Ct., 619, 38 L. Ed., 434.

"In *United Zinc & Chemical Co. v. Britt,* 258 U. S., 268, 275, 42 S. Ct., 299, 66 L. Ed., 615, 36 A. L. R., 28. * * * we pointed out the theory upon which liability may exist for injuries suffered by an infant, although the circumstances would give no cause of action to an adult: 'Infants have no greater right to go upon other people's land than adults, and the mere fact that they are infants imposes no duty upon landowners to expect them and to prepare for their safety. On the other hand, the duty of one who invites another upon his land not to lead him into a trap is well settled, and while it is very plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait

as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation to them although not to an adult. * * * There can be no general duty on the part of a landowner to keep his land safe for children, or even free from hidden dangers, if he has not directly or by implication invited or licensed them to come there.'

"Considering the peculiar circumstances of the present cause, it is clear that if the plaintiff had been an adult he could not recover; and we are unable to find any sufficient evidence from which the jury could have properly concluded that the railroad company either directly or by implication invited or licensed him to climb upon the strut to a point from which he could touch the bare wire 30 feet above the street (track?). The motion for an instructed verdict should have been granted."

In *Sioux City & P. R. Co. v. Stout,* 17 Wall., 657, 662, 21 L. Ed., 745, the pioneer turntable case, the Court said:

" * * * When it was proved to the jury that several boys from the hamlet were at play there on this occasion, and that they had been at play upon the turntable on other occasions, and within the observation and with the knowledge of the employees of the defendant, the jury were justified in believing that children would probably resort to it, and that the defendant should have anticipated that such would be the case."

The case of *United Zinc Co. v. Britt,* 258 U. S., 268, 42 S. Ct., 299, 66 L. Ed., 615, 36 A. L. R., 28, presents in its facts a much stronger case for the plaintiff than the case at bar. In it the facts were these: The zinc company had formerely established a plant for the making of sulphric acid; it abandoned the plant and tore down the buildings but left a basement and cellar in which water had accumulated; the water was clear in appearance but was in fact dangerously poisoned by sulphuric acid and zinc sulphate. The father of two children had been traveling with them and had encamped

some distance from the place. A traveled way passed within 100 to 120 feet of it. The children, eight and eleven years of age, went upon the premises and into the water, where they were both poisoned and died. At the trial the Judge instructed the jury that if the water looked clear but was in fact poisonous, and thus the children were allured to it, the company was liable. A verdict for the plaintiff was rendered, which was affirmed by the Circuit Court of Appeals. 264 F., 785. The judgments were reversed by the Supreme Court of the United States, holding:

"Infants have no greater right to go upon other people's land than adults, and the mere fact that they are infants imposes no duty upon landowners to expect them and to prepare for their safety. On the other hand the duty of one who invites another upon his land not to lead him into a trap is well settled, and while it is very plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation to them although not to an adult. But the principle if accepted must be very cautiously applied. * * * In the case at bar it is at least doubtful whether the water could be seen from any place where the children lawfully were and there is no evidence that it was what led them to enter the land. But that is necessary to start the supposed duty. There can be no general duty on the part of a landowner to keep his land safe for children, or even free from hidden dangers, if he has not directly or by implication invited or licensed them to come there. * * * *Union Pacific Ry. Co. v. McDonald,* 152 U. S., 262, 14 S. Ct., 619, 38 L. Ed., 434, is less in point. There a boy was burned by falling into burning coal slack close by the side of a path on which he was running homeward from other boys who had frightened him. It hardly appears that he was a trespasser and the path

suggests an invitation; at all events boys habitually resorted to the place where he was. Also the defendant was under a statutory duty to fence the place sufficiently to keep out cattle. The decision is very far from establishing that the petitioner is liable for poisoned water not bordering a road, not shown to have been the inducement that led the children to trespass, if in any event the law would deem it sufficient to excuse their going there, and not shown to have been the indirect inducement because known to the children to be frequented by others. It is suggested that the roads across the place were invitations. A road is not an invitation to leave it elsewhere than at its end."

The case of *Graves v. Washington Water Power Co.*, 44 Wash., 675, 87 P., 956, 958, 11 L. R. A. (N. S.), 452, is strikingly parallel with that at bar. The facts were that a bridge 100 feet above the water of a stream was supported by steel piers with criss-crossed strips, and about 30 feet up them ran a heavily-charged wire; the plaintiff, a boy of about fifteen years, attempted to climb the pier, using the criss-crossed slats, set at an angle, as a ladder. Pigeons were in the habit of nesting about the bridge, and boys sometimes climbed the piers to catch them or to find their nests, and sometimes as a matter of sport in playing such games as "follow your leader." The evidence did not show that the defendant had actual knowledge of boys climbing the piers, or that there was such an amount of climbing the piers near the wires as would impute knowledge thereof to it. The boy had climbed up 30 feet or more when he came in contact with the charged wire and received severe injuries. The connecting plates or strips of steel with sharp edges formed an angle, rather than being attached at right angle as in the case with the rungs of an ordinary ladder. The Court said:

"The lattice work upon the sides of these piers was not intended to constitute ladders or furnish means of access to or from the top of the bridge. The public was not invited

nor expected to use such lattice work for such a purpose. No one, other than an employee or agent of the city intrusted with some duty in connection with the inspection, supervision, care, or repairing of said bridge, would have any authority to climb up or down said lattice work. This being true, it follows that respondent as one of the general public had no authority justifying his presence at the place where he was injured."

In denying the plaintiff's right to recovery, the Court said:

"As a matter of law, it may be said that a person of ordinary care and prudence, in the operation of an agency so dangerous as electricity, would and should be exceedingly careful and so arrange the means of handling and transmitting this powerful and mysterious element as to protect from harm any person or persons whom he might reasonably expect to be in a position to receive harm therefrom. But to say that the owner or operator of an electric plant should foresee and anticipate the presence of children or others in places where the ordinarily prudent, careful, and foreseeing person would not expect or deem it likely for them to be, would impose a burden and responsibility for which there is no justification in law. We do not think it can be said that this appellant should have anticipated that boys would climb up this almost perpendicular pier and from it reach over and take hold of the electric wires strung upon its poles 30 or more feet above the ground, or that the city's watchmen and other servants there stationed would permit such an occurrence. If the company's responsibility extended this far, it would be difficult to say where a limit could be fixed. In this State we see electric wires stretched on poles through our towns and cities, and along highways, through farms, orchards, and forests in the country. Can it be held that companies operating these wires must keep them out of reaching distance of every high tree, building, fence, wall,

pole or other place of elevation into or upon which a boy may possibly be allured by birds' nests or other attractions?"

In *Brown v. American Mfg. Co.,* 209 App Div., 621, 205 N. Y. S., 331, it was held that a boy who climbed a 30-foot tower supporting high-tension electric wires on defendant's own land, in the yard of tenement houses in which children played, though a licensee on the premises, was a trespasser and defendant was not liable for his death resulting from a contact with wires, where defendant had no reasonable ground to anticipate that children would attempt to climb the tower.

In *Mayfield Water & Light Co. v. Webb,* 129 Ky., 395, 111 S. W., 712, 713, 18 L. R. A. (N. S.), 179, 130 Am. St. Rep., 469, the Court said:

"Here the wire was 18 feet above the street. It could only be reached by a person climbing the electric light pole or walking up the guy wire of the telephone company. In all the cases where a liability has been imposed for what is known as an attractive nuisance to children, the nuisance has been placed within their reach. We know of no case where this has been applied to things put 18 feet above the ground, which may only be reached by climbing a pole or walking up a wire. Such structures are not an invitation to children to use them.  *  *  *  As long as electric light wires are not put under ground, they must be put upon poles, and, where they are placed above the street as high as 18 feet, the company should not be required to anticipate that children will climb up to the wires and get hurt.  *  *  * Such a wire is not a dangerous instrumentality, attractive or alluring to children within the meaning of the *Turntable cases.  *  *  * "*

In *Parker v. Charlotte Electric R. Co.* (1915) 169 N. C., 68, 85 S. E., 33, where defendant's feed wire was placed about twelve inches below and underneath a bridge, and plaintiff, while playing upon the bridge with other boys, got down on his knees on the floor of the bridge, reached his

hand between the lower railing and floor, and touched the feed wire, receiving the injury complained of, it was held that defendant had exercised every possible care in the disposition of its wires, and had no reason to expect that a thirteen-year-old boy would lie down on the bridge and endeavor to touch them; and as such action could not reasonably have been foreseen, defendant was not liable.

In *Stansfield v. Chesapeake, etc., Co.*, 123 Md., 120, 91 A., 149, 151, 52 L. R. A. (N. S.), 1170, the Court, in denying recovery to an adult who had climbed a pole by the spikes that were driven into it for the use of employees, concluded the opinion by saying: "Where  *  *  *  those engaged in the distribution of electric current have placed their wires above and beyond the sphere of peril to the public and to the occupants of neighboring premises, it would be subjecting them to an unduly strict responsibility to require them to provide against the possibility that their own appliances might be utilized by strangers as a means of access to the conditions which prove to be injurious."

In the case of *Simonton v. Citizens, etc., Co.*, 28 Tex. Civ. App., 374, 67 S. W., 530, 532, the electric company maintained poles along a highway into which were driven spikes from a point near the ground, to allow ascent for placing and repairing wires, such being the ordinary custom; plaintiff, a boy of seven years, climbed the pole, using the spikes as a ladder; he lost his balance near the top of the pole, fell, and was seriously injured. The Court held that the instrumentality of the defendant, so equipped, was not an invitation to children to use it so as to make the company liable for the injury. The Court said:

"The facts pleaded do not show that the pole which is alleged to have been negligently maintained by the defendant was specially or unusually attractive, or that such pole was not constructed and maintained in the manner in which poles of this character are ordinarily constructed throughout the country.  *  *  *  In all of the *Turntable cases*

the invitation is implied from the fact that by reason of the turntable being left unlocked, so that it could be, and was, used by children as a plaything, it was especially and unusually attractive. * * * We believe that it would be unwise to extend the doctrine of the *Turntable cases* to cases of this character. It would seriously retard the material progress and cripple the business interests of the country if persons owning and operating public utilities which, from their very nature, require the use of structures and appliances placed in proximity to public highways, should be forbidden to use or maintain any structure or appliance of a kind calculated to attract and allure children to attempt their use as playthings, and which when so used, becomes dangerous. As said by Judge Gaines * * * we believe that the doctrine upon which the *Turntable cases* have been ustained goes to the limit of the law, and sound public policy forbids that it be further extended."

I do not think that there is any evidence in the case that warranted the submission of an award of punitive damages.

For these reasons I think:

1. That the defendant's motion for a directed verdict should have been granted.

2. If not, that there was reversible error in charging as complained of in the tenth exception.

3. In any event, that there should be an order for a new trial *nisi* requiring the plaintiff to remit the verdict awarding punitive damages.