## MINNIE DAVIDSON, AS MOTHER AND NATURAL GUARDIAN OF ERNEST DAVIDSON, AN INFANT v. OTTER TAIL POWER COMPANY.[1]

December 9, 1921.

No. 22,469.

**Question of negligence of the parties for the jury.**

The plaintiff's minor son was injured by coming into contact with an electric wire of the defendant. Whether the defendant was negligent, and whether the boy was negligent, were questions for the jury, and it was error to direct a verdict for the defendant.

Action in the district court for Otter Tail county to recover $30,000 for injuries to plaintiff's minor son. The case was tried before Parsons, J., who at the close of the testimony granted defendant's motion for a directed verdict. From an order denying her motion for a new trial, Minnie Davidson appealed. Reversed.

*C. E. Warner*, for appellant.

*N. F. Field*, for respondent.

DIBELL, J.

This is an action by the plaintiff, the mother of Ernest Davidson, a boy ten years and three months old at the time of his injury, to recover in his behalf damages which he sustained by coming into contact with a live electric wire of the defendant. The court directed a verdict

[1]Reported in 185 N. W. 644.

for the defendant. The plaintiff appeals from the order denying her motion for a new trial.

The defendant, an electric power company, had a dam and switch house and other buildings, and owned a tract of land, 5½ miles southwest of Fergus Falls at a point called the Dayton Hollow Dam. About 200 feet southeast of the switch house it had a duplex house for the use of the two men in charge of the plant, each of whom had charge of a shift of 12 hours. One of these men was the husband, now deceased, of the plaintiff, and the father of Ernest, and he lived with his wife and a large family of children in the house mentioned.

In the early part of 1914 the company was adding a second story to its switch house. In the second story the lightning arresters were to be placed. At the time they were outside the switch house resting on wooden blocks and were inclosed by a wooden shack. These lightning arresters, as they appeared from the outside and so far as they need be described, consisted of three tubular tanks about 18 inches to 2 feet in diameter and 6 feet high, bushed at the top. They were about 2 feet apart and were parallel with the south side of the switch house. At the top they were connected with electric wires running from the first story of the switch house. The wires carried a voltage of 38,000 or 40,000, and when they entered the tanks were about 7½ feet from the ground. The tanks were not in themselves dangerous.

In the course of the construction of the second story, the company built an outside stairway attached to the south side of the switch house. At its top it connected with a platform from which there was an entrance through a doorway into the second story. The foot of the stairway was about 16 inches from the nearest part of the wooden shack inclosing the lightning arresters and was 3 to 3½ feet high. The tank nearest the stairway was something like 18 inches inside the shack. As the stairway ascended it passed easterly and away from the electric wires. There was a railing on the outside, and at the lower end wooden slats were nailed across to keep persons from going to the second story. There is a dispute as to whether the railing and the slats were in place at the time Ernest was injured, which was in the early part of July,

1914. The plaintiff claims that they were not; the defendant claims that they were. The presence of the railing, with slats across the top of the lower end, seems as favorable to a right of recovery as its absence.

It is uncertain just how Ernest was injured. The trial was conducted upon the theory that his hand came in contact with a live wire. The evidence is that a space within 2 feet of wires so heavily charged is a danger zone. Not much attention is given to this fact. The danger of a "brush" shock, such as was involved in Hoppe v. City of Winona, 113 Minn. 252, 129 N. W. 577, is not developed. It is certain that Ernest was playing about the stairway. He was found at the foot where he had fallen. There is a claim that he was on the fourth or fifth step, that there was no railing, and that he slipped or fell, and in trying to save himself caught the wire. This seems improbable; it is perhaps impossible. It is quite as likely that he was playing on the slats at the lower end of the stairway, or on the railing, and slipped and was about to fall, and caught the wire, or in some way came in contact with it. In any event he was severely burned by electricity.

The wires carried a deadly current. We have had occasion to comment upon the amount of watchfulness and diligence necessary to constitute the ordinary care which negatives negligence where such an agency is used. Drimel v. Union Power Co. 139 Minn. 122, 165 N. W. 1058; Hoppe v. City of Winona, 113 Minn. 252, 129 N. W. 577, 33 L.R.A.(N.S.) 449, Ann. Cas. 1912A, 247; Musolf v. Duluth Edison Elec. Co. 108 Minn. 369, 122 N. W. 499, 24 L.R.A.(N.S.) 451; Gilbert v. Duluth Gen. Elec. Co. 93 Minn. 99, 100 N. W. 653, 106 Am. St. 430. We have had occasion to comment upon the care exacted of those using a dangerous agency, such as dynamite, when children are about. Mattson v. Minnesota R. Co. 95 Minn. 477, 104 N. W. 443, 70 L.R.A. 503, 111 Am. St. 483, 5 Ann. Cas. 338; Vills v. City of Cloquet, 119 Minn. 277, 138 N. W. 33; Eckart v. Kiel, 123 Minn. 114, 143 N. W. 122; Erickson v. W. J. Gleason & Co. 145 Minn. 64, 176 N. W. 199. Always the duty of exercising care commensurate with the dangers to be apprehended from so perilous an agency as electricity is recognized in the cases. Daltry v. Media Co. 208 Pa. 403, 57 Atl. 833;

Meyer v. Menominee, 151 Wis. 279, 138 N. W. 1008; Hayes v. Power Co. 95 S. C. 230, 78 S. E. 956; Consolidated Co. v. Healy, 65 Kan. 798, 70 Pac. 884; Caruso v. Troy Gas Co. 153 App. Div. 431, 138 N. Y. Supp. 279; Wittleder v. Citizens Co. 50 App. Div. 478; Connell v. Keokuk Electric Ry. & P. Co. 131 Iowa, 622, 109 N. W. 177; Nelson v. Branford Co. 75 Conn. 548, 54 Atl. 303; Benton v. North Carolina P. S. Corp. 165 N. C. 354, 81 S. E. 448. And in these cases, as in others, the duty of exercising commensurate care, when children are about, is emphasized.

The application of the general rule is often difficult. It is so here. Ernest was at home. No fence separated the house and the plant. Davidson had a large family of children and the defendant knew it. The children, the jury could find, played about the plant much as they chose. They were forbidden entrance to the switch house. There is evidence that they played about the stairway. If the defendant permitted Ernest to play about the stairway, or where he might be hurt by the wires, or knew or should have known that he was doing so, and the jury could find such to be the fact, it was its duty to exercise ordinary care, which means watchfulness and diligence commensurate with the danger arising from the presence of the live wires. That the wires could have been guarded without appreciable expense and without interference with their operation seems conceded. The boarding of the inclosing shack did not extend above, or much above, the tanks at the point next to the end of the stairway. Ernest, if playing on the railing, or on the slats crossing at the lower end of the stairway, would come dangerously close to the wires. He would be in danger. The boarding could have been extended upward, and danger from the wires obviated.

We are of the opinion that the questions of the defendant's negligence and the boy's contributory negligence upon the facts recited, were for the jury.

We have given the facts as accurately as is possible, appreciating, of course, that they should be taken favorably to the plaintiff on this motion. We have read the original settled case, where question and answer appear, to get a better view than the printed narrative record

150 M.—29.

gives. The evidence as to distances is not always certain. The defendant's witnesses do not at all times quite agree. More than 6 years have elapsed since the accident. Ernest was then only a little over 10, and his brother, the only other person present, was 2 years younger, and other children of the family, who testified at the trial, were youthful. Naturally enough they may have impressions from talks since rather than an actual recollection of what occurred then.

Order reversed.