# FERDINAND WEBER v. J. E. BARR PACKING CORPORATION AND ANOTHER.[1]

February 6, 1931.

No. 28,263.

[1]Reported in 234 N. W. 682.

 

*Donohue, Quigley & Donohue,* for appellant J. E. Barr Packing Corporation.

*Briggs, Weyl & Briggs,* for appellant Northern States Power Company.

*R. B. Brower* and *J. B. Himsl,* for respondent.

HOLT, J.

Defendants appeal from judgment rendered in an action to recover for the death of Elmer Weber caused by the alleged negligence of defendants. After the verdict each defendant moved for judgment notwithstanding the verdict. There was no motion for a new trial.

The defendant packing corporation owns and operates an extensive canning plant at St. Cloud, Minnesota. At the peak of the canning season it employs up to 400 persons and operates both day and night. Tin cans are used in carload lots. A street running north and south formerly separated the pea canning plant on the west from that for canning beans and other products on the east, but the street was vacated and a spur track laid on the east side just west of the bean canning plant upon which railroad cars are spotted for unloading empty cans. The cans are unloaded into an elevator or "booster" located on the east side of the track so that the cans may be pitched into it from the side door of the car. An electric motor raises the cans in the booster some 25 or more feet, emptying them into a "twist" box supported on a frame trestle which runs from the bean canning plant on the east to the pea canning plant at a height of about 20 feet. The twist box is designed to turn the cans so as to deposit them upon a conveyor with the open or top end of the can up. The conveyor is an open metal box about five inches wide, the sides of which consist of narrow metal bands or strips, and the bottom is an endless cable running over rollers. This cable is operated by an electric motor, and thus about 200 cans a minute are conveyed from the twist box to the filler in the pea plant. The conveyor was bolted to iron cross bars

attached to the trestle, and its length from the twist box to where it entered the pea canning plant was approximately 66 feet; but from the twist box to the roof erected to protect against contact with the power lines was not half the distance. It is necessary to a smooth operation of the conveyor that every can thereon stand on its bottom. The twist box does not always deposit them thus.

Elmer Weber, a lad almost 15 years old, was employed by the defendant packing corporation about a week prior to July 16, 1929, to sit at the twist box on the 16-inch plank walk running along the north side of the conveyor for the purpose of righting any can that might slide onto the conveyor in any other position than upright. Occasionally a can would fall on its side when some distance away from the twist box or had passed unnoticed in a wrong position onto the conveyor, and the one stationed at the twist box would then, along the plank walk, pursue the out of place can, overtake and right it before it reached the entrance to the pea canning plant. This plank walk was about two feet lower than the top of the conveyor until it came within eight or ten feet of where the power wires passed diagonally over it; then it slanted down to where it was five and one-half feet below, and continued on that level to the pea canning plant. To protect the conveyor against wind, which when strong tipped the cans over, 12-inch boards were necessary; whether such boards were placed on both or only one side is left in doubt. Elmer was five feet one and one-half inches tall.

When the railroad spur track was built it was necessary for the power company to move the poles carrying the electric power lines. One of these poles was a few feet north of the conveyor and east of the pea canning plant. The power wire here concerned was within two and one-half feet of the top of the metal conveyor. It was apparent to the packing corporation that this was dangerously close, and so the 16-inch walk was dropped down, as stated, when approaching the wires, and a roof five and one-half feet wide and six and one-half feet long was placed over the conveyor and extending over the walk. But even at that a man five feet seven inches tall could reach up beyond this wire several inches when on the

inclined part of the walk just before passing under the roof. There is also some evidence that if cans were displaced near the roof or where the walk was dropped down, a boy of Elmer's size could not well reach or right them without pulling himself up on the framework of the conveyor. The walk along the conveyor was used also in oiling the rollers upon which the endless cable ran.

It appears that Elmer had worked at the plant during the day on July 16 and was put to work in the evening. Soon thereafter, between 8:15 and 8:30 o'clock, he was seen prone, his legs hanging on either side of the conveyor and his body, below the shoulders, resting on the power wire mentioned. The wire carried 2,300 volts, and life was extinct. No one saw him as he approached this place, and what led him there must ever remain uncertain. It is obvious from the burns that the electric current grounded through his body coming in contact with the metal conveyor and the power wire. The insulation or covering originally upon this wire was gone, but there is testimony suggesting that the ordinary insulation of wires carrying such voltage, if grounded through a person, would likely not save his life.

The contention of the defendant power company is first that there was no negligence on its part proved. We think there was evidence to take the issue to the jury. The power company, when it made the changes to accommodate the spur track, placed the high voltage wires so close to the walk beside the conveyor that no person could safely pass or work thereon. It was so obviously dangerous that the defendant packing corporation recognized it and sought to protect its employes by the small roof over the walk where it passed under the wires. Even after that was done we think the wires were within the reach of persons on the walk, and the jury could find that work connected with conveyor would be dangerously near the wires, and that the party in control of such deadly instrumentalities, in the exercise of due care, ought to have anticipated accidents therefrom. And certainly it was for the jury to say whether it was negligence for the packing corporation to station a boy of Elmer's age up on this walk, from which but a step up would reach

this small roof and deadly wire, without giving any warning by sign or otherwise of the danger. We think the following cases involving deaths or injuries from electric high voltage wires show that the issue of negligence of both defendants was for the jury. Musolf v. Duluth E. E. Co. 108 Minn. 369, 122 N. W. 499, 24 L.R.A.(N.S.) 451; Hoppe v. City of Winona, 113 Minn. 252, 129 N. W. 577, 33 L.R.A.(N.S.) 449, Ann. Cas. 1912A, 247; Davidson v. Otter Tail Power Co. 150 Minn. 446, 185 N. W. 644; Thornton Bros. Co. v. Northern States Power Co. 151 Minn. 435, 186 N. W. 863, 187 N. W. 610; Pattock v. St. Cloud P. S. Co. 152 Minn. 69, 187 N. W. 969; Bunten v. Eastern Minn. Power Co. 178 Minn. 604, 228 N. W. 332; Neumann v. Interstate Power Co. 179 Minn. 46, 228 N. W. 342.

Contributory negligence of Elmer must also be considered for the jury so far as the power company is concerned. He being dead, there is a presumption of care in his favor. It is claimed Elmer had stepped aside from the place he was required to work, that he had no duty to attend where he came in contact with the wire, and that canning was temporarily suspended. All these matters the jury could and did resolve against defendants.

But contributory negligence of the sole heirs and beneficiaries of Elmer, his parents, is also invoked as a defense by both defendants. This defense is based on the violation by the parents of the same statutes upon which plaintiff predicates the charge of negligence against the packing corporation. G. S. 1923 (1 Mason, 1927) §§ 4100 and 4101; and also G. S. 1923, § 4103, as amended, 1 Mason, 1927, id. The last named section does not cause us any difficulty here; for the court charged the jury that if Elmer's parents knew that he was employed in work that endangered life and limb there could be no recovery, and submitted for the jury's determination whether or not attending this can conveyor was an occupation dangerous to the life and limb of Elmer. The parents testified that they did not know that the boy was set to work up on a walk not protected by any railing and in close proximity to wires carrying high power electrical current. The jury could well accept their

testimony as true. And no just fault can be found with the jury's determination that the place where Elmer was set at work was dangerous to the life and limb of a child of his age and experience, considering its distance from the ground and lack of safeguards and warning signs. Harvey v. Ruff, 164 Minn. 21, 204 N. W. 634. And being a violation of § 4103, the defenses of contributory negligence and assumption of risk are not open to the packing corporation, the employer. Dusha v. Virginia & Rainy Lake Co. 145 Minn. 171, 176 N. W. 482, 23 A. L. R. 632.

There remains the contention that §§ 4100 and 4101 above cited impose a penalty upon the parents as well as upon the employer for allowing a child under 16 years to work after seven o'clock in the evening. It is conclusively shown that Elmer went to work after seven o'clock in the evening and also, we think, that his parents knew that he did so. It is settled law in this state that the violation of a statute or ordinance by a plaintiff in an action to recover damages for the tort of a defendant does not as a matter of law prove contributory negligence so as to defeat recovery. 4 Dunnell, Minn. Dig. (2 ed. & Supp.) § 7027. Among the many cases there cited we may point to Ericson v. D. & I. R. R. Co. 57 Minn. 26, 58 N. W. 822; Day v. Duluth St. Ry. Co. 121 Minn. 445, 141 N. W. 795; Schaar v. Conforth, 128 Minn. 460, 151 N. W. 275; Dohm v. R. N. Cardozo & Brother, 165 Minn. 193, 206 N. W. 377.

It is to be remembered that this is an appeal from the judgment, where the only error raised is the denial of the motion for a directed verdict and the subsequent denial of the motion for judgment notwithstanding the verdict. At the most, under the above decisions, defendants could urge that the violation by the parents of Elmer of § 4100 of the statute was evidence of negligence, which the jury was entitled to consider in determining whether or not such violation contributed as a proximate cause to Elmer's death. It cannot therefore be held as a matter of law that on this score the parents were guilty of contributory negligence so as to bar recovery.

The point made in the briefs and in the court below, that the sole remedy for Elmer's death was under the workmen's compensation

act, we understood was abandoned when the case was presented in this court. Obviously, in view of Elmer's age and the finding of the jury, amply supported, that he was employed in an occupation dangerous to life and limb, it is futile to claim that the case is within the jurisdiction of the industrial commission.

As to the taxation of $10 disbursement to a witness, there is no data in the record warranting this court to interfere with the same.

The judgment is affirmed.

