# WAYNE KEEP v. OTTER TAIL POWER COMPANY.[1]

December 31, 1937.

No. 31,294.

[1]Reported in 277 N. W. 213.

Field & Field and Conmy & Conmy, for appellant.
R. J. Stromme and Dell & Rosengren, for respondent.

JULIUS J. OLSON, JUSTICE.

This was an action brought by Wayne Keep, a minor, by his father, to recover damages for injuries sustained on September 11, 1934, while climbing one of defendant's poles supporting high tension electric wires. We shall refer to the injured boy as plaintiff, and where we speak of his father shall refer to him as Mr. Keep. Defendant's motion for direction of verdict was denied. The jury returned a verdict for plaintiff. Defendant's motion for judgment notwithstanding was also denied. Thereupon judgment was entered, and defendant appeals therefrom. In this situation we have, under our decisions, but one question to determine, whether the evidence in the record sustains the verdict. We are not concerned with errors at the trial or excessiveness of verdict.

Defendant is engaged in the business of manufacturing, distributing, and selling electric current to its customers. For our purpose we need only consider the particular pole upon which these wires were strung and with which plaintiff came into contact.

The situation can best be visualized by reference to a photostatic copy of exhibit D, being the alleged offending pole and its general surroundings, which we hereto append. The pole is in the foreground of the picture.

It will be observed that there are two crossarms, the upper carrying two high tension wires, one at each end, fastened to insulators. The lower crossarm carries but one wire. The wire at the top of the pole is not charged with electricity. Its only purpose is to conduct lightning, if and when striking the line, to a point thereon where it may be grounded. The three high tension wires are those appearing in the picture which have insulators. Each of these

carries 40,000 volts. The ground wire connects with the static wire at the top of the pole, its purpose being to lead into the ground the interference that comes from lightning and thereby avoid harm to the electric wires. It is fastened to the pole by wire staples at intervals of about 30 inches. The pole on which the accident happened is approximately 28 feet in height above the surrounding ground. The lower crossarm is almost 21 feet above the ground while the upper is approximately three feet higher. As will be seen, the lower crossarm carries no wire to the east, *i. e.,* to the right in the picture.

This line was constructed something like 21 years prior to the time of accident and has been used for its original purpose ever since. At this point of the line it is parallel with an old road infrequently used for travel at and immediately preceding the time of accident, the road having been relocated.

The Keep family resides upon a half section farm located some four and one-half miles to the north and east of the village of Herman. The particular pole here involved and others of similar type are located upon a portion of the farm occupied by the Keep family, and approximately one-half mile distant from the farm buildings. As the picture discloses, the locality is open farm land of the level type characteristic of that section of the state. The line of poles and wires strung upon them presents a familiar picture of what one sees everywhere in the open country in this state. That portion of the Keep farm upon which this line was built and maintained was a cultivated field and was so used in 1933, that being the year when the Keep family moved onto the farm, and was similarly used in 1934. In July a hailstorm struck that locality with such force as to make the harvesting of the crop there growing not worth while. Mr. Keep, in order to salvage what he could out of the damaged crop, herded his livestock upon this field. The responsibility of herding the cattle so as to keep them out of a ten-acre tract of growing corn located less than a quarter of a mile away from this area was intrusted to the plaintiff, then past 12 years of age, and a younger brother, 8 years of age.

As will be seen, there is nothing in connection with this pole or any of the others located upon the Keep farm making them of any particular attraction to children any more than would any other pole of similar type. Plaintiff testified, and there was other testimony to the same effect, that around the butt of each of these poles there is a small area not available to the raising and harvesting of grain where farming is done by machinery; that these spots, because of weeds and grass growing upon them, furnish excellent cover for gophers and other rodents so that from these they may go forth on their many depredations; likewise, that pheasants lay their eggs and hatch them in such places; that the Keep children and others of the neighborhood would sometimes, in fact frequently during the summer season, resort to these places to play, hunt for pheasant eggs, and try their skill at catching gophers. Nowhere in the record, however, is there any intimation that any child prior to the time of this accident had ever attempted to climb this or any other of defendant's poles.

On the day of the accident plaintiff and his younger brother started out upon their job of herding the cattle shortly after the noonday meal. Plaintiff was riding a full-grown horse, his brother a pony. The boys were accustomed to playing with a rope which was used as a lariat or lasso. They practiced throwing the loop upon various objects. Plaintiff got the notion while riding his horse that he wanted to practice upon the lower crossbar to see whether he could land the loop around it. He tried many times but failed. Finally, in order to bring himself closer to it, he stood upright on the back of his horse and from that vantage point sought to throw the loop around the end of this crossbar. He finally succeeded in so doing, but the loop caught, because there is a bolt extending through the crossbar and the V-shaped support beneath. Try as he might, plaintiff was unable to loosen the rope. He then dismounted the horse and viewed the situation with the object in view of finding some means to reach his cherished rope. With a boy's ingenuity thus actively called into play, he discovered for the first time, although he claims to have seen and been around this pole numerous

times theretofore, that the ground wire was not firmly attached to the pole; that the staples did not seem firmly to tie it into the pole. The lower staple was only a short distance, perhaps 30 inches, above the level of the ground. He pulled the slack in the wire, something between five and six inches, into a loop above the staple so as to afford a toe hold on his way up. Plaintiff's own version of how he ascended the pole is perhaps best told in his own language thus (examined by his counsel):

Q. "How did you climb the post? You tell the jury.

A. "Well, I took my left hand and pulled the wire out and took my left foot and stuck it in and put my arm on the post, this arm (indicating).

Q. "When you say 'this arm' which arm do you mean?

A. "The right. And pulled with my foot and pulled with my arm and pulled up, and after I got up again I let go with my arm and pulled the wire out and stuck my foot in there and then pulled up higher and pulled it out again."

In this fashion he ascended the pole, stopping at each staple and shaking his rope in the hope of unfastening it from the crossarm. He failed to accomplish that purpose and ultimately came in contact with the high voltage wire, causing the injuries for which the jury by its verdict awarded him compensation.

■ The general rule applicable to those who transmit high voltage electricity is that they must exercise a degree of care to guard against injury commensurate with the danger to be apprehended but are not insurers against injury. Bunten v. Eastern Minnesota Power Co. 178 Minn. 604, 608-609, 228 N. W. 332, 334. Judge Taylor there carefully reviewed our prior cases and many cases from other jurisdictions. Amongst other things he said:

"But where an electric company maintains its wires at a height at which they would not come in dangerous proximity to such persons or things as *it reasonably ought to anticipate might rightfully come under or near them, it is not chargeable with negligence because someone doing an act which it had no reason to expect suffers*

*an injury which might not have been sustained if the wires had been higher."* (Citing many cases.)  (Italics supplied.)

See also, 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 2996, and cases cited in notes; Annotation, "Electric Wires–Injury to Children," 100 A. L. R. 621, and particularly p. 624, "c. Wires reached by climbing."

That is why high tension wires are strung at sufficient height to avoid coming in contact with anyone likely to be within reach.  We think the correct rule is stated in 9 R. C. L. p. 1198:

"In the erection and maintenance of their poles, wires, and other appliances, they are bound to anticipate only such combinations of circumstances and accidents and injuries therefrom as they may reasonably forecast as likely to happen."

■ The important question here is whether defendant because it failed to keep the ground wire securely stapled thereby violated a duty to children who might be upon or in the vicinity of these poles whether at play or otherwise.  It is appropriate to note that there is no question about defendant having properly placed these wires upon its poles and that they were at a sufficient height to be out of harm's reach.  Nor can there be any claim of liability for failure to insulate them.  That this is so clearly appears from the court's instructions.  Thereby the jury were limited in their inquiry to the single issue therein submitted.  The court said:

"You are instructed that the only charge of negligence that you are privileged to consider in the case is the single question of whether or not the defendant was negligent in the manner it maintained the ground wire on the pole in question, and whether or not that negligence, if you find there was negligence in this respect, was the proximate cause of the injury."

And plaintiff candidly admits in his brief that "the only issue is whether the power company knew or should have known that the continued maintenance of the loose ground wire upon the pole *in the nature of an artificial ladder* [italics supplied] involved a risk of death or a serious bodily injury to children playing adjacent there-

to." It is also conceded "that the accident would not have happened if Wayne Keep had not climbed the pole in question" and "that at the time he climbed the pole he was a trespasser."

To sustain the verdict plaintiff cites and relies upon such cases as Keffe v. Milwaukee & St. Paul Ry. Co. 21 Minn. 207, 18 Am. R. 393; Znidersich v. Minnesota Utilities Co. 155 Minn. 293, 193 N. W. 449; Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 261 N. W. 194, and many other cases. The Keffe case is the one that gave rise to what is often referred to in the books as the "turntable cases." The Znidersich case is, of course, the one upon which plaintiff principally relies. It is his view, and it was obviously the view of the trial court, that the insecurely fastened ground wire furnished the boy with a means of ascending the pole thereby bringing about as a link in the chain of causation that which led to plaintiff's hurt. There are, however, vitally important distinctions between the facts in that case and this.

There (155 Minn. 295) "the pole was *in the highway immediately adjacent to the playgrounds,* which were not fenced. *It was supplied with facilities for climbing* the same by workmen in the employ of defendant, *in the shape or form of iron pegs driven into each side a given distance apart, from near the ground to the cross-bars holding the wires in place, thus forming a permanent ladder up which any person might ascend the pole. * * * In the condition described it stood as an implied invitation or temptation for the indulgence of the youthful habit of boys to climb whatever may be within reach when at play."* (Italics supplied.)

Obviously this ground wire was not, as plaintiff found it, attached to the pole in such fashion as to expedite climbing it. It was a harmless and inoffensive thing in its then condition. The ingenuity employed by plaintiff to aid him in climbing the pole amounted to an unusual accomplishment, a real feat. It is doubtful that any grown-up person would have had the ability so to improvise this wire as to make it of any such use as was here employed. He did not ascend the pole because of any boyish desire to climb it, but to accomplish what he was after, to retrieve his rope. Only by

the exercise of a boy's ingenuity in materially altering its existing situation and condition was the wire transformed into a means of ascent, i. e., by drawing the slack of the wire through the staples into a single place, thereby affording him a toe hold. If plaintiff's theory were to be sustained so as to extend the doctrine of the Znidersich case to include liability upon such facts as here disclosed, then the next and natural step would be to hold any defendant liable where there is nothing but the bare pole beneath the service wires. This we may not do because, as this court said in Erickson v. M. St. P. & S. S. M. Ry. Co. 165 Minn. 106, 109, 205 N. W. 889-890, 45 A. L. R. 973:

" 'To the irrepressible spirit of curiosity and intermeddling of the average boy there is no limit to the objects which can be made attractive playthings. In the exercise of his youthful ingenuity, he can make a plaything out of almost anything, and then so use it as to expose himself to danger. If all this is to be charged to natural childish instincts, and the owners of property are to be required to anticipate and guard against it, the result would be that it would be unsafe for a man to own property, and the duty of the protection of children would be charged upon every member of the community except the parents or the children themselves.' "

If in the instant case this line of poles were supporting only harmless telephone wires but the same ground wire had broken on plaintiff's way up to retrieve his lasso, and because of the breaking of the wire he had fallen, causing him great bodily injury, is there anyone, plaintiff included, who would have the temerity of seeking damages because of the resulting harm? Yet the supposed means, insofar as reaching the object sought is concerned, are identical with those before us. The only difference is that here the harm came from the highly charged electric wires, while in the supposed case his fall and consequent hurt would be caused by the same defective wire. There was nothing about this pole or anything on it that created in plaintiff any desire to reach its top. He was not attempting to climb it as a feat of dexterity but only to retrieve his rope. In this respect this case differs from the tree-climbing

cases where children are hurt by coming into contact with near-by high voltage wires and where they climb for the sake of performing difficult and daredevil feats similar in kind and purpose to those of mankind's supposed arboreal ancestors.

■ Considerable effort was made at the trial to prove that plaintiff and other children played around or near these poles over a considerable period of time prior to the date of accident. The purpose of this effort was undoubtedly to bring this case within the rule of such cases as the Znidersich and Gimmestad cases, i. e., that this was a playground for children and so used by them and that defendant in the exercise of due care knew or should have known thereof. That effort utterly failed. That this was no playground obviously appears from the fact that the area within which the poles were built and maintained was a field used for grain farming. Until the hailstorm came that was its only use. After that the use changed to that of a pasture.

Nor is there any testimony in the case indicating that any child had ever attempted to climb any of these poles. As a matter of fact Mr. Keep testified at the trial: "I never dreamed he [plaintiff] would climb the pole." Yet we are urged to affirm a judgment for plaintiff upon the theory that defendant in the exercise of "due care" should have "foreseen" or "anticipated" that this slightly loose ground wire "involved a risk of death or a serious bodily injury to children playing adjacent thereto." To adopt such rule of liability would indeed make it "unsafe for a man to own property, and the duty of the protection of children would be charged upon every member of the community except the parents or the children themselves." Erickson v. M. St. P. & S. S. M. Ry. Co. 165 Minn. 106, 110, 205 N. W. 889, 45 A. L. R. 973.

On the subject of playground, Mr. Keep likewise truthfully and accurately characterized the situation by testifying that the boys "would be just as likely to play along there as anywhere," referring to the poles upon the Keep place.

Cases from other jurisdictions are helpful in that we find unanimity of support for the conclusion we have reached. We shall cite only a limited number deemed in point. Anderson v. Kansas

City Public Service Co. 127 Kan. 375, 273 P. 397; Graves v. Washington Water Power Co. 44 Wash. 675, 87 P. 956, 11 L.R.A.(N.S.) 452; Cox v. Des Moines Elec. Light Co. 209 Iowa, 931, 229 N. W. 244; Burns v. City of Chicago, 338 Ill. 89, 169 N. E. 811; Howard v. St. Joseph Transmission Co. 316 Mo. 317, 289 S. W. 597, 49 A. L. R. 1034; Miller v. Suburban Power Co. 41 Ohio App. 70, 179 N. E. 202; Grube v. Mayor of Baltimore, 132 Md. 355, 103 A. 948, L. R. A. 1918E, 1036; O'Gara v. Philadelphia Elec. Co. 244 Pa. 156, 90 A. 529; Bonniwell v. Milwaukee L. H. & T. Co. 174 Wis. 1, 182 N. W. 468, 470; Empire District Elec. Co. v. Harris, 82 F. (2d) 48; Texas-Louisiana Power Co. v. Bihl (Tex. Com. App.) 66 S. W. (2d) 672.

The last cited case is most strikingly similar to ours. There a boy 11 years of age climbed an electric light pole belonging to defendant power company, and, as here, the ground wire was loose. Shortly after the accident this was investigated and there was found to be a slack in the wire amounting to 27 inches. (Here it was between five and six inches.) The court on appeal held against the claim of the boy's parents (the boy was killed in the accident) that the power company had been negligent in permitting the wire to become "very slack when it should have been tight against the pole"; that "at places it formed loops or loose places which the deceased used in making his fatal climb by placing his feet or hands therein." [66 S. W. (2d) 674.] And there the pole was located near the edge of a sidewalk in a residential district of the city of Fort Stockton, in a congested area and a place where children were accustomed to play. (Here the location was in a cultivated field half a mile from the nearest resident.) But the court disposed of plaintiff's contention by setting aside the verdict and ordering judgment for defendant. (A photograph of the pole appears in 66 S. W. [2d] 673.)

In Bonniwell v. Milwaukee L. H. & T. Co. 174 Wis. 1, 4, 182 N. W. 468, a "bright, spirited boy, full of the buoyancy of youth, thoughtless of danger," undertook a hazardous venture and came to his death by contact with defendant's highly charged electric wires.

The court said (174 Wis. 4) : "This is one of a class of cases which must always appeal strongly to the sympathy of every one cognizant of the facts." But in that case as in this (174 Wis. 7) :

"The owners of private property, whether they be the owners of homes, business places, or traction lines, cannot be held insurers against all accidents which may happen on their premises. The consequences which would result from holding the owners of property to the extreme degree of care insisted upon in this case are well pointed out in two opinions by Mr. Justice Vinje in Zartner v. George, 156 Wis. 131, 145 N. W. 971, 52 L.R.A. (N.S.) 129, and Emond v. Kimberly-Clark Co. 159 Wis. 83, 149 N. W. 760. We hold that the defendant was not bound to anticipate that a child or children would climb the tower in such a manner as to be endangered by its wires, and that the question of the negligence of defendant should not have been submitted to the jury."

Upon reason and authority, we are constrained to similarly hold in the instant case. The judgment is reversed and the court below directed to grant defendant's motion for judgment.

GALLAGHER, CHIEF JUSTICE (dissenting).

There is no serious dispute concerning the facts, about the only controversy being as to whether they show the place in question to be a "playground." If treated in the light of a modern city "playground," the territory immediately adjacent to the place of the accident would not bear the dignity of that title. If considered as a place where farm boys assembled and carried on their youthful activities, the term "playground" would not be a misnomer. Whatever it is called, boys, including plaintiff, frequently gathered there, and defendant's line patrolmen had ample opportunity to discover this fact and the purposes for which they used it.

Defendant rests upon its motion for judgment. It is well established that in such a case the only question for consideration is whether it clearly appears from the record that plaintiff is not entitled to recover. 3 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 5085. In determining that question, the view of the evidence most favorable to plaintiff must be accepted. A judgment will

not be reversed even though the trial court in its discretion could have granted a new trial. It must be clear from the whole record that the moving party, as a matter of law, was entitled to judgment on the merits. Thom v. N. P. Ry. Co. 190 Minn. 622, 252 N. W. 660; Farmers State Bank v. Merchants & M. State Bank, 164 Minn. 300, 204 N. W. 965; Marquardt v. Hubner, 77 Minn. 442, 80 N. W. 617.

The law applicable to the instant case has been definitely settled in this state. The writer of the majority opinion, Mr. Justice Olson, has referred to these principles, with characteristic modesty, by quoting from the opinions of other judges. No clearer enunciation of the rules applicable can be found than in his own opinion in the case of Anderson v. Eastern Minnesota Power Co. 197 Minn. 144, 148, 266 N. W. 702, 704:

"The law applicable to the facts hereinbefore related is well settled. We think the court in Humphrey v. Twin State G. & E. Co. 100 Vt. 414, 421, 139 A. 440, 444, 56 A. L. R. 1011, 1018, accurately states the applicable rule:

" 'Electricity has come to be a necessary factor in almost all lines of activity. Its usefulness should not be impaired or curtailed. But it is highly destructive when it escapes control; its capacity for harm is but little reduced by distance; it is invisible and undiscoverable; it strikes instantly and without warning. We deem it of the highest consequence, especially in a rural state like ours where hunters, fishermen, and others roam the woods when lawful, almost at will, and where high tension electric lines run in every direction, and wire fences are in common and increasing use, *that those dealing in such a deadly agency should be accountable to all whose likelihood of injury could reasonably be foreseen.*' (Italics supplied.)

"Our own cases are to the same effect:

" 'Electric companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus. The degree of care varies with the danger involved. Where wires carry strong and dangerous currents of electricity a high degree of care

must be exercised.' 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 2996. See also Interstate Power Co. v. Thomas (C. C. A.) 51 F. (2d) 964, 84 A. L. R. 681; Anno. 14 A. L. R. 1023 and 56 A. L. R. 1021."

If harm to others may be anticipated because of the fashion in which the undertaking is conducted, liability to those injured because of the method pursued follows whether or not the circumstances of the particular injury could be foreseen. Faribault v. Northern States Power Co. 188 Minn. 514, 247 N. W. 680. Where high tension lines are so constructed that it is to be anticipated that persons will come into dangerous proximity to the lines, it is the duty of those having control of the lines to protect such persons from danger and to warn them so that they may protect themselves. Weber v. J. E. Barr Packing Corp. 182 Minn. 486, 234 N. W. 682; Neumann v. Interstate Power Co. 179 Minn. 46, 228 N. W. 342; Pattock v. St. Cloud P. S. Co. 152 Minn. 69, 187 N. W. 969; Thornton Bros. Co. v. Northern States Power Co. 151 Minn. 435, 186 N. W. 863, 187 N. W. 610; Hoppe v. City of Winona, 113 Minn. 252, 129 N. W. 577, 33 L.R.A.(N.S.) 449, Ann. Cas. 1912A, 247; Musolf v. Duluth Edison Elec. Co. 108 Minn. 369, 122 N. W. 499, 24 L.R.A.(N.S.) 451. Where the presence of children may be expected in proximity to a dangerous instrumentality of a character uncalculated to warn them of the hazard they run, due care demands that guards adequate to prevent their injury be adopted. Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 261 N. W. 194; Davidson v. Otter Tail Power Co. 150 Minn. 446, 185 N. W. 644.

It is conceded that defendant was dealing with a deadly agency. The poles carrying the wires transmitting this agency were maintained at a place frequented by plaintiff and other children. There were no warning signs on the pole in question nor on any other pole in the vicinity. The fact that no boy had been known to climb any of the poles at the place under consideration is of no special consequence. Afton Elec. Co. v. Harrison, 49 Wyo. 367, 54 P. (2d) 540, 541.

As the record stands the only question in the case is: "Should defendant, the distributor of a deadly agency, have reasonably foreseen that a child of plaintiff's age and discretion, known to frequent the place, would utilize the ground wire for the purpose of climbing the pole?" To me the answer to that question, in the light of the decisions of this and other courts, was clearly for the jury. What the majority opinion appears to overlook is that modern boys possess the same ingenuity in devising methods for climbing poles that modern engineers possess in devising methods for erecting lines. We cannot apply 19th century standards to the one and 20th century standards to the other.

The inclination of boys to climb trees is known. Notorious also is their proclivity for climbing poles to which are attached appurtenances which afford a means of ascent. The fact that the means afforded do not make ascent easy is no deterrent. The fact that skill is required is an added inducement to a boy to display his agility. That the ground wire was used as a means of accomplishing the feat in this case shows that it could be adapted to that purpose. Decisions that a jury may find that those maintaining power lines should reasonably anticipate the use by children of pegs or cleats attached to poles (Znidersich v. Minnesota U. Co. 155 Minn. 293, 193 N. W. 449; note, 36 A. L. R. 34, at 184) ; of a lumber pile (Meyer v. Menominee & M. L. & T. Co. 151 Wis. 279, 138 N. W. 1008) ; of bridges (note, 36 A. L. R. 34, at 160) ; of trees through whose branches electric lines pass (notes, 36 A. L. R. 186; 53 A. L. R. 1344, at 1356) ; and of lattice transmission towers (Hart v. Union Mfg. & Power Co. 157 S. C. 174, 154 S. E. 118), as a means of climbing into dangerous proximity to power lines, indicate that the jury in this case might reasonably find that a prudent man would anticipate the use of the ground wire by children, known to frequent the adjacent land, as a means of climbing the pole which would result in their coming into dangerous proximity to the transmission wires. How, then, can we say as a matter of law that a ground wire of the character of the one involved in this case is not such an appurtenance adapted for climbing that a reasonable man could anticipate its use for that purpose by children? About the

only difference I can see between the means afforded in the instant case and those afforded in the examples referred to is the difference between tweedledum and tweedledee, and to me that difference is too slight in a case where the injuries are so serious that they admittedly justify a verdict of approximately $10,000 to admit of a holding as a matter of law that there was no negligence. I think that the use to which Wayne Keep put the ground wire in question might reasonably be found by the jury to be a foreseeable use, and that is sufficient to sustain a finding of negligence even though the particular manner in which it was used was unforeseeable. Faribault v. Northern States Power Co. 188 Minn. 514, 247 N. W. 680.

The case of Afton Elec. Co. v. Harrison, 49 Wyo. 367, 373, 54 P. (2d) 540, decided by the supreme court of Wyoming on February 18, 1936, involved facts very similar to the facts in this case. They are summarized in the opinion in the following manner:

"The structure to which the uninsulated wires were attached consisted of two poles, each somewhat more than 15 feet high. They sloped inward toward the top, and were about 7 feet and 7 inches apart at the bottom, and about 4 feet apart at the top. Toward the top were two horizontal wooden bars fastened to the poles so as to hold them together, the top bar being 14 feet and 7 inches from the ground, and the second about 1 foot and 7 inches below that. It was on this lower horizontal bar to which the deceased climbed, and in some way, by slipping or otherwise, probably threw his hands up and back and touched two of the wires, about 2 feet above him, and was by that act electrocuted. Close to the bottom of the poles were erected what are called juniper stubs, to serve as support to the poles. They were about 6 feet tall, about 2 feet from the poles, and were attached to the poles by several strands of wire in two different places, one of the fastenings being about 12 to 14 inches from the ground, and the other from 3 to 3½ feet from the ground. The deceased apparently first climbed to the top of one of these stubs, using the strands of wire already mentioned as a sort of ladder. There were further attached to the poles two wooden crossbars, about 4 feet or a little more from the ground on one pole

and crossing over to the other pole to a distance of about 9 feet from the ground. The deceased reached his destination, probably, by the help of these crossbars. The testimony shows that the poles were easily climbed by reason of these various attachments."

In sustaining a verdict in favor of the administrator for the death of a ten-year old boy, the court said [49 Wyo. 382]:

"The case, therefore, is not one in which it can be said that liability was clearly established. It would seem that the case is on the border line. And, though the point is not free from doubt, we think that there is sufficient testimony in the case to make it a question of fact as to whether the electric corporation should be held liable."

For the reasons stated, I do not believe the verdict, which has been approved by the trial court, should be disturbed.

PETERSON, JUSTICE (dissenting).
I concur in the dissent of Mr. Chief Justice Gallagher.

