# AMELIA SCHROEPFER v. CITY OF SLEEPY EYE.[1]

July 2, 1943.

No. 33,496.

[1]Reported in 10 N. W. (2d) 398.

*Streissguth & Gislason* and *E. A. Hauser,* for appellant.
*Flor & Reim,* for respondent.

PETERSON, JUSTICE.

Plaintiff, as special administratrix, sues to recover for the wrongful death of her husband, alleged to have been caused by defendant's negligence. She recovered a verdict, and defendant appeals.

Decedent was employed by the Cargill Elevator Company in its elevator at Sleepy Eye, performing miscellaneous work consisting of loading and unloading grain and of making general repairs. On July 9, 1941, at the end of his day's work of painting the exterior of the elevator, while he was on the roof of a lean-to shed on the south side of the elevator, he was electrocuted by taking hold of a wire connection and the brace of a crossarm.

Defendant supplied the elevator with electricity from its electric plant by means of three wires, carrying electric current of 2300 voltage, strung from its power lines to a crossarm attached to the west side of the elevator at the southwest corner. The crossarm, which was about 30 feet above the ground and about 4 feet above the roof of the lean-to shed, projected beyond the south wall of the elevator approximately 3 or 4 feet. A metal brace extended from the projecting end of the crossarm to the south wall of the elevator. On the crossarm were three glass insulators to which defendant's wires were attached. At this point connection was made with the wires in a conduit running into the elevator. In making the connection, short wires covered with rubber insulation were run from the insulators to the conduit. The connections of the wires at the insulators were covered with tape. The connection at the southernmost insulator was made in such a way as either to leave bare and exposed, or to become so through the action of the elements, a small part, which corresponded with a small burn on decedent's left hand.

At any rate, this particular connection, but not the others, was bare at the time decedent took hold of it. There was evidence to show that if the connection had been properly covered with tape the "chances" were that no harm would have befallen decedent, and that, if a person took hold of the exposed connection and the crossarm brace, it would complete a circuit and send electric current through his body sufficient to cause death.

Two pairs of employes were engaged in the work of painting. Decedent and another employe were doing the south side. They used the roof of the lean-to shed, to which they gained access through a door in the elevator opening thereon, as the base of their operations. The roof of the lean-to shed sloped very steeply away from the elevator. Two other employes were painting the west side. Each pair, in doing their work, used a scaffold, which they raised and lowered by means of pulleys and ropes. At about 5:30 in the afternoon decedent and his working partner descended from their place up on the wall, where they had been working, to the roof of the shed. Being quitting time and the end of the week, they commenced to put away their materials, tools, and equipment.

Because decedent was the only employe who had a watch, it was the regular practice for him to notify the others when it was quitting time. Pursuant to the practice, he walked on the roof of the shed to the west side of the elevator to notify the two employes working there that it was time to quit. This brought him in close proximity to the crossarm and the wire connections referred to. Nobody saw or knew precisely what happened until someone heard "a buzz and a yell." Decedent next was seen grasping with one hand the insulator with the partly bare and exposed connection and with the other hand holding onto the crossarm brace. His body was doubled up. He was in contact with the insulator and crossarm brace in such a way as to cause electrocution. That is what happened to him.

It appears without dispute that decedent had been warned, and that he was fully aware, that it was dangerous to come in contact with the electric wires. There was, however, no evidence that he

knew that a part of the connection was bare. Approximately three months prior to his death, decedent and one of defendant's employes installed the crossarm in question to replace one that had been burned, but he did not assist in making the new connection between defendant's wires and the conduit leading into the elevator. This was done by defendant's employe, who, referring to the insulation of the wires, told decedent that, "I would fix them up as good as I could." In making the installation of the crossarm, they stood on the roof of the lean-to shed, to which apparently they gained access through the door. It was too high to use a ladder.

There was testimony by Mr. Fred Otto, an electrical engineer of ability and experience, that, according to accepted standards of electrical engineering practice, wires carrying high voltage, such as those here involved, where the same are accessible, as a safety measure to prevent harm to persons coming in contact with them, should be either insulated or installed with an 8-foot clearance. Here, part of the connection was not insulated, and the clearance was only 4 feet.

Defendant contends: (1) That it was not negligent, because harm occurring on the roof of a building under the circumstances was not reasonably to be apprehended; (2) that decedent was guilty of contributory negligence as a matter of law; and (3) that the court erred in failing to submit assumption of risk as a separate and distinct defense. Some other points, relating to the instructions, have been raised. These we have considered and find without merit. No separate mention need be made of them.

■ A distributor of electricity, because it is a dangerous, deadly, and silent force, is under an affirmative duty either to insulate its wires or to place them beyond the danger line of contact where people might reasonably be expected to go. The rule is but a concrete application of the general one in negligence cases, that a person is under a legal duty to exercise due care to avoid harm reasonably to be apprehended. Weber v. J. E. Barr Packing Corp. 182 Minn. 486, 234 N. W. 682; Neumann v. Interstate Power Co. 179 Minn. 46, 228 N. W. 342; 2 Dunnell, Dig. & Supp. § 2996; 18 Am.

Jur., Electricity, p. 485, § 93. In 14 A. L. R. 1024, the text of an extensive annotation states the rule with respect to the care to be exercised toward workmen:

"While the terms of stating the measure of duty of the electric company are different, there is a great uniformity in the decisions to the effect that one maintaining a high tension electric transmission line without proper insulation, at places where workmen are likely to come into contact with it to their injury, is liable for the injury."

There is a supplemental annotation to the same effect in 56 A. L. R. 1021.

Conversely, where a distributor of electricity places its wires in such a way that there is no reasonable ground to anticipate that people will come in dangerous proximity to them, there is no breach of legal duty and consequently no basis for a charge of negligence. Bunten v. Eastern Minn. Power Co. 178 Minn. 604, 228 N. W. 332.

The decisive question here is whether or not there was any reasonable cause to anticipate that people might come in dangerous proximity to the partly uninsulated connection on the crossarm. This was a fact question. The jury was warranted in inferring that the owner of the elevator, the same as the owner of any other structure, would take ordinary measures to repair and to preserve it. It is a common practice for workmen to paint structures to preserve them and to make repairs by going upon different parts thereof, including the roof. Such acts are reasonably to be anticipated. Hoppe v. City of Winona, 113 Minn. 252, 129 N. W. 577, 33 L.R.A.(N.S.) 449, Ann. Cas. 1912A, 247 (workman painting a bridge over the Mississippi River); Steindorff v. St. Paul Gaslight Co. 92 Minn. 496, 100 N. W. 221 (workman repairing a gutter on the roof of a building); Standard Acc. Ins. Co. v. Minnesota Utilities Co. 207 Minn. 24, 289 N. W. 782 (employe of a creamery cleaning a gutter and drainpipe on the roof). Numerous similar cases are found in the annotations *supra*. In Pattock v. St. Cloud P. S.

Co. 152 Minn. 69, 187 N. W. 969, a finding of negligence was sustained for the death of a carpenter electrocuted while engaged in working on the roof of a lean-to shed being erected.

The case of Bunten v. Eastern Minn. Power Co. 178 Minn. 604, 228 N. W. 332, *supra,* upon which defendant relies, is entirely different, because in that case an electric company had strung its wires across a spur railroad track at a height of 25½ feet, ample for the safety of trainmen on the top of boxcars, and plaintiff's injury was caused by loading on a flatcar placed under the wires a road-building machine with a boom 20 feet high, which came in contact with the wires. It was held that the electric company had no reasonable cause to anticipate that anyone would come in contact with the wires so placed at that point. In the instant case there was reasonable cause to anticipate that workmen might be on the roof of the lean-to shed at and near the crossarm and the wires. The door opening from the elevator to the roof of the lean-to shed itself was notice that by use of it men would go onto the roof to perform whatever duties required their presence there. In fact, that very thing was done when defendant's employe with the aid of decedent installed the crossarm in question. The difference between the Bunten case and the instant one is that the former involved unforeseeable, and the latter foreseeable, harm. The finding of negligence is amply sustained by the evidence that defendant either failed fully to insulate the connection or made it in such a manner that it became uninsulated within a few months and that it permitted such condition to exist at a place where it had reason to believe people might go.

■ The contention that decedent was guilty of contributory negligence is based upon the claim that the evidence shows as a matter of law that he knew that the wires were deadly dangerous and that he "walked deliberately up to the cross-arm and placed his hand on the high tension wires." We think that the evidence permits a finding that decedent knew that the wires were dangerous; that he had no reason to believe that they were partly uninsulated; and that it wholly fails to show what he did except to walk on the roof toward

the crossarm. True, decedent had been warned and knew that the wires were dangerous. But that in itself is not sufficient to charge him with contributory negligence. To charge a person with contributory negligence, warnings and knowledge of danger must extend to the particular danger causing the injury. Theisen v. Minnesota P. & L. Co. 200 Minn. 515, 274 N. W. 617. Here, the warnings and knowledge went only to the known and obvious dangers incident to contact with the high-tension wires, but not to those incident to the partly uninsulated connection. There is no evidence that decedent was aware of that particular danger. The presumption is that he exercised due care for his own safety. For lack of proof as to what he did other than to walk toward the crossarm, there was failure of proof to displace the presumption of due care on his part. "The presumption of due care does not vanish in the absence of evidence showing the conduct of the deceased." Lee v. Zaske, 213 Minn. 244, 248, 6 N. W. (2d) 793, 795. An inference that decedent exercised due care and was not guilty of contributory negligence was permissible. The question was one of fact for the jury. Standard Acc. Ins. Co. v. Minnesota Utilities Co. 207 Minn. 24, 289 N. W. 782; Theisen v. Minnesota P. & L. Co. 200 Minn. 515, 274 N. W. 617; Colusa Parrot M. & S. Co. v. Monahan (9 Cir.) 162 F. 276.

3. The charge given relative to assumption of risk was:

"If a person recklessly exposes himself to known or imminent danger, unnecessarily, in a manner that a person of ordinary care would not do under the circumstances, he assumes the risk of such danger and is guilty of contributory negligence and cannot recover for any injuries sustained by him under such circumstances, and the same rule applies if some other person brings suit for his death."

Defendant complains that the instructions failed to submit assumption of risk as a separate and distinct defense. Much of the argument has been to the effect that assumption of risk and contributory negligence are separate and distinct defenses and that a party has a right to have them so submitted. It is urged that as-

sumption of risk, as applied to cases like the one at bar, rests upon the maxim *"Volenti non fit injuria"*—that one who unnecessarily incurs danger assumes the risk of resulting injury as a matter of law. That is precisely what the trial court told the jury, except that it added that such assumption of risk constituted contributory negligence. In this the trial court was of the opinion expressed by us recently in Hubenette v. Ostby, 213 Minn. 349, 350, 6 N. W. (2d) 637, 638, where we said:

"In the ordinary personal injury action, where plaintiff puts himself in a position to encounter known hazards which the ordinarily prudent person would not do, he assumes the risk of injury therefrom. Such assumption of risk is but a phase of contributory negligence and is properly included within the scope of that term."[2]

If the trial court had not stated that such assumption of risk constituted contributory negligence, there would be no basis for any claim of error. Aside from the name by which the defense was designated, the substance of the charge given is the same as that asked for. In the final analysis, the claim of error relates simply to the label attached to the defense—that it should have been "assumption of risk" instead of "contributory negligence." Substance rather than name controls. A mere label is of no importance. The

---

[2]In Owens v. Union Pacific R. Co. 319 U. S. 715, 720, 63 S. Ct. 1271, 1274, 87 L. ed. ..., the Supreme Court of the United States said:

"The common-law defenses, assumption of risk, contributory negligence, and the fellow-servant rule were originated and developed in common ground. Not entirely identical in conception, they conjoined and overlapped in many applications. The overlapping areas first concealed, then created a confusion which only served to create more; so that in time the three became more, rather than less, indistinguishable. *And assumption of risk took over also, in misguided appellation, large regions of the law of negligence. What in fact was absence of departure from due care by the defendant came to be labelled 'assumption of risk.'* Apart from this effect, so long as the area of application was overlapping and each when established had the effect of defeating liability, it was not a matter of great moment to distinguish the defenses sharply or carefully, when the facts would sustain one." (Italics supplied.)

label attached does not change the substance of things. Since the instruction given incorporated the rule of assumption of risk exactly as insisted upon by defendant, it has no ground for complaint. In that view, if the question has not already been foreclosed .by our decision in Hubenette v. Ostby, *supra,* it is unnecessary to consider whether there is any distinction in principles between assumption of risk and contributory negligence.

Affirmed.

MR. JUSTICE MAGNEY, not having been a member of the court when this case was argued and submitted, took no part in its consideration or decision.

